**Affirmed and Opinion filed June 10, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00076-CV

---

## IN THE INTEREST OF J.D., A CHILD

---

**On Appeal from the 306th District Court
Galveston County, Texas
Trial Court Cause No. 12-CP-0079**

---

## O P I N I O N

Appellant, W.D. (the Mother), appeals from the trial court's judgment terminating her parental rights to her daughter, J.D. (the Child). In three issues, the Mother challenges the sufficiency of the evidence to support the trial court's termination findings under Chapter 161 of the Texas Family Code. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

On December 6, 2012, the Texas Department of Family and Protective Services of Galveston County (the Department) filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting Parent-Child Relationship, requesting to terminate the parental rights of the Child's

parents. According to the testimony of the Department's investigative caseworker, Andi Tavarez, the Department received a referral on December 4, 2012, alleging physical abuse of the Child, who was then two months old.[1] The Child had been admitted to the hospital, University of Texas Medical Branch at Galveston, because she suffered a broken left arm while in the Mother's care. Further testing revealed that the Child had also suffered a fracture to the end of her thigh bone approximately two weeks before the broken arm. Testing also showed possible rib injuries, referred to as "cupping." Tavarez stated that the Child was hospitalized for three to four days and required a cast on both her arm and leg before being discharged.

Tavarez interviewed the Mother at the hospital and testified that the Mother initially stated she did not know how the Child was injured. The Mother was the Child's only caregiver at the time the fractures occurred. After further questioning, the Mother stated that her five-year-old daughter (the Sister) may have injured the Child. The Mother stated that only she, the Child, and the Sister were home the night she discovered the baby's injured arm. The Mother explained the Child was in a swing in the living room and the Sister was on the couch nearby when the Mother went into the adjoining kitchen to prepare a bottle. The Mother stated she heard the Child make a small noise like a little grunt, but she did not cry or scream. The Sister said she did not touch the Child. When the Mother returned to the living room a short time later, the Child was "crooked" or "slanted" in the swing. According to the Mother, the Sister later stated she tried to take the Child out of the swing.

The Mother told Tavarez that the night she brought the Child to the hospital, she allowed her to remain sleeping in the swing until her next feeding because the

---

[1] The record reflects the Child was born September 18, 2012.

Child was not crying and the Mother did not know anything was wrong. Tavarez stated that the Mother told her that when she picked up the Child to feed her, she noticed her arm "didn't look right" and was "flimsy and soft," and she took her to the hospital in the early morning hours.

After learning that the Child had suffered a prior injury, Tavarez again interviewed the Mother, who stated she did not know how the Child suffered the leg fracture. The Mother later claimed as a possible explanation that she once heard the Child make a noise in the back seat of the car when the Sister was with her, and that the Sister had once tried to take the Child out of a bassinette.

The Child's medical records described her arm fracture as a "complete transverse left sided humeral fracture" and her broken leg as "[s]ubacute metaphyseal corner fractures of the left distal femur." Tavarez discussed the Child's injuries with one of the treating physicians, Dr. Susan Gerik, who believed the injuries could not have been accidental and the Child would have screamed in pain when her arm was broken. Gerik also was of the opinion that the Mother's five-year-old daughter was not capable of causing the injuries. The Child's medical records also include the doctor's assessment that given the Child's age and the type of fracture, "there is high concern for abuse." The records reflect that a social worker and CPS were contacted for further investigation. The records state, "Further evaluation reveals distal femur fracture (L) approximately 10-14 days old and possible rib fractures. CPS and law enforcement arrived and interviewed mother of the patient." The records additionally reflect that an ophthalmologist was consulted to rule out retinal hemorrhages caused by shaking. The retinal tests were negative.

Tavarez also interviewed Dr. Kwabena Sarpong, a child abuse expert at the hospital. Sarpong examined the Child, obtained a history from the Mother, and explained the Child's injuries to the Mother. Sarpong's report reflects the Mother

3

told him she "mostly" lived alone with the Child; the Sister and an older brother spent most of their time with grandparents, and the Child's father is not involved in her life. Sarpong's report also reflects that the Mother told him that she was in the kitchen when the Sister told her she had put a bottle in the baby's mouth and the baby began choking. The Sister then picked the Child up by her arm, but the Mother did not hear the Child cry. The Mother told him the Sister is "jealous of her baby sister and tries also to play with her like a doll." Sarpong's report included his opinion that the Child suffered physical abuse on more than one occasion.

Tavarez additionally testified that upon consideration of the physicians' assessments, the medical evidence, the Mother's statements, and other information from its investigation, the Department concluded that the Child's injuries were consistent with physical abuse. As a result, the Department removed the Child from the Mother's care and sought temporary custody.[2] In its temporary order, the trial court found "aggravated circumstances."[3] The Mother initially was granted limited supervised visitation, but the following month, at the attorney and guardian ad litem's request, the Mother was not permitted to visit the Child without an order from the court.

The case proceeded to trial before the court in December 2013. At trial, in addition to Tavarez, the primary witnesses were the Mother, Dr. Sarpong, and the

[2] The record reflects that on December 20, 2012, the Regional Attorney for the Texas Department of Family and Protective Services was substituted as counsel for the Department in place of the Galveston County Criminal District Attorney's Office. The Mother's counsel argued at trial that the Mother was not treated fairly because the Child's foster mother was an attorney employed by the Galveston County District Attorney. The Mother has not raised this complaint in an issue on appeal.

[3] Texas Family Code Section 262.2015 authorizes the trial court to waive the requirement of a service plan and the requirement to make reasonable efforts to return the child to the parent if the parent has subjected the child to "aggravated circumstances." Tex. Fam. Code § 262.2015(a). The court may find aggravated circumstances if, among other things, the child is a victim of serious bodily injury inflicted by a parent or a parent has engaged in conduct that would constitute injury to a child under Section 22.04 of the Texas Penal Code. *Id*. § 262.2015(b)(2), (3)(H). The Mother has not raised an issue challenging this finding on appeal.

4

Sister, who was then age six.

The Mother testified that between the Child's birth in September 2012 and the baby's December 2012 hospitalization, only she, the Sister, and the Child lived at her apartment. Tavarez testified that the Mother told her a male friend visited her the night of the injury after the Child and the Sister were asleep. The Mother told Tavarez that the male friend does not hold or pick up the Child. Tavarez testified the Mother also said she visited another friend and her mother and brother visited her shortly before the Child's injuries were discovered. The Mother acknowledged that none of these individuals were alone with the Child during the time that her injuries occurred.

At trial, the Mother claimed for the first time that on Thanksgiving, November 22, 2012, the Child spent the night with the Mother's mother (the Grandmother), and that was the only time the child had been out of the Mother's sight. The Grandmother confirmed in her testimony that she kept the Child the night before Thanksgiving so that the Mother could go to a party. She did not notice any problem with the Child's leg and the Child was not cranky or fussy. The Mother stated that when she picked up the Child the next day, she was "normal" and "just basically herself." The Mother never claimed the Grandmother had injured the Child. When asked if she had told the Department that the Child spent Thanksgiving night at the Grandmother's house, the Mother replied, "They never asked." The Grandmother denied that she injured the Child and stated she did not see anyone else do so.

The Mother testified that she first noticed the injury to the Child's arm between 12:00 and 1:00 in the morning of the day she took her to the emergency room. The Mother stated that when the child began to wake up in her swing, "I noticed that when I bent to pick her up her arm just like flopped down." The Mother testified that when she moved the Child before taking her to the hospital,

5

she did not cry or yell. She admitted, however, that she saw the Child cry and yell at the emergency room when her arm was examined.

The Mother testified that she learned the Child's arm was broken when the doctor at the emergency room told her and showed her the child's x-rays. When asked whether she told the doctor if she knew how the Child's arm was broken, the Mother stated, "Basically when he showed me I was just like I was lost for words. I was like—I asked him how could this have happened." The Mother also testified that she did not know about the Child's healing leg fracture or possible rib injury before the Child's hospitalization. The Mother denied telling Dr. Sarpong her theory that her five-year-old daughter might have accidentally injured the Child. The Mother conceded, however, that Sarpong said the Child's broken arm could not have been caused by a five-year-old. The Mother stated Sarpong told her that an adult "would have had to have stepped on [the Child's] arm."

The Mother testified that she had taken the Child to the doctor for her two-month checkup and immunizations on November 26, 2012, eight days before the Child was hospitalized. She claimed that the doctor moved the Child's legs to determine that her hips had the full range of motion and found her normal. The Mother also stated that the Child did not cry during the examination. The Mother claimed that she asked Sarpong if the healing injuries would have been seen during the Child's recent check-up, and Sarpong told her the Child would have cried at that examination. The Mother also testified that Sarpong told her that only "shaken baby syndrome" could have caused the Child's leg fracture.

Dr. Sarpong testified about his examination of the Child's injuries. He is a board certified pediatrician, professor and Medical Director of the Pediatrics Clinics at the University of Texas Medical Branch in Galveston, Director of the ABC Center for Child Abuse Services, and a consultant for Texas State Forensic Assessment Center. Sarpong testified that he reviewed the Child's x-rays with the

6

radiologist, Dr. Leonard Swischuk. The Child suffered a broken bone in the upper part of her left arm and a fracture to the end of her left thigh bone. He related that at the time of the bone survey, the radiologist stated that the child's leg fracture was approximately two weeks old. Sarpong additionally stated that the radiologist found that the Child may also have a "cupping to the ribs" injury, but Sarpong did not see a rib injury on the x-rays and did not include the possible rib injury in his report. He testified to his opinion, which was included in the medical records and stated:

> The history that mother gave is not consistent with the injuries sustained. In my opinion, the injuries the child has sustained are consistent with inflicted injuries and child physical abuse that occurred on more than one occasion. This is based on the type of fractures and the varying ages of the fractures.

When asked directly whether "[s]omeone intentionally caused the fractured arm and leg," Sarpong replied, "Yes, sir." He stated it is highly unusual for a two-month-old to have these injuries, and except for a car accident or similar occurrence, the injuries could not be caused accidentally.

Sarpong further explained that when a child comes in with a fractured arm like the Child suffered and abuse is suspected, a "full bone x-ray" is performed because some fractures, like that to the Child's leg, are very difficult to find on examination. He testified that "it is very difficult to fracture that part of the bone"; to do so, requires "vigorous shaking." Sarpong also testified that because it is very difficult to break the tip of the bone, normally it is "chipped," which is "very classic certainly in textbooks for child abuse." He explained that such chips, "classic metaphyseal fractures[,] cannot be seen by anybody with a naked eye." Because of this, he testified that "[i]t would not be unusual" for the Child's doctor not to notice such a leg fracture while performing a wellness check and giving shots a few days before the child came in with a broken arm. Sarpong testified that

7

"normally the kids might cry the first few days, and when the healing process starts they don't—we might not find it."

Sarpong testified that at the time he examined the Child, there was no suspicion of any congenital issues regarding the fractures. The Mother testified at trial that when she was born, she (the Mother) had two broken legs. She conceded that during the days the Child was in the hospital, the Mother did not tell the doctors about her history or that the Child may have a bone disorder, such as brittle bones. Another Department caseworker, Abbey Ransom, testified that in May 2013, the trial court ordered the Child tested for osteogenesis imperfecta. Dr. Sarpong described osteogenesis as a genetic condition that predisposes children to have multiple fractures. The test was negative for genetic mutations, and the Child required no follow-up testing or treatment for any bone disorder. The Child suffered no more broken bones or other injuries after her removal to foster care.

Sarpong testified that he said the leg fracture required "excessive force", either "vigorous shaking or the kid was put into some form of machine that shook the leg." Sarpong further stated that the "leg is definitively an abusive injury" unless the two-month-old child had been put in an instrument that shook that part of the leg or had been in a "very high velocity accident." He explained that to cause the transverse fracture to the Child's arm required either a "direct impact" or a "forceful break." He testified that the arm injury was caused by a "major amount of force," and a high percentage of children would scream in pain because "That's a lot of force, a lot of pain." When asked, "Is a 5-year-old capable of producing these injuries, Sarpong answered, "No." On cross-examination, the doctor acknowledged that hypothetically, it would be possible for the break to have occurred if a 50-pound bag fell on the Child.

The Sister also testified. After some initial questions, the court stated its satisfaction that the six-year-old Sister understood the difference between the truth

8

and a lie. When asked what happened to the Child, she answered, "I broke her arm." The Sister initially said "I pushed it" or "hit" it "once," and that the Child cried until the Mother came out of the bathroom. She also said that she took the Child out of the swing that night and "accidentally dropped her." The Sister answered "No," after the Mother's counsel asked, "And did something else happen after you dropped her?" Counsel then asked, "Did you fall on her?" and the Sister answered, "Yes." The Sister said she then put the Child back in the swing and that the Child was crying when the Mother came back into the room. The Sister explained that she did not tell the forensic interviewer that she broke the Child's arm because she was afraid something bad would happen to her mother.[4] She was afraid her mother would go to jail, and her mother had been in jail before.

After the conclusion of the trial, the court found by clear and convincing evidence that termination of the Mother's parental rights is in the best interest of the Child. *See* Tex. Fam. Code § 161.001(2). The court also found clear and convincing evidence that the Mother engaged in the following conduct as grounds for termination, as set out in its decree of termination signed January 3, 2014:

> 1. The Mother knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.001(1)(D), Texas Family Code; and
>
> 2. The Mother engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(1)(E), Texas Family Code.

*See* Tex. Fam. Code § 161.001(1)(D), (E). The court appointed the Department as

---

[4] In rebuttal, the Department played the compact disc of the Sister's forensic interview at the Galveston County Children's Advocacy Center; however, the audio was too weak for the trial court to hear the child and the interview was not transcribed.

the Child's permanent managing conservator. This appeal followed.[5]

## II. BURDEN OF PROOF AND STANDARD OF REVIEW

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear and convincing standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. While proof by clear and convincing evidence must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *See R.H. v. Tex. Dep't of Fam. & Protective Servs.*, ____ S.W.3d ____, 2013 WL 1281775, at *5 (Tex. App.—El Paso 2013, no pet.). This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

When determining legal sufficiency, we review "all the evidence in the light most favorable to the court's finding to determine whether a reasonable trier of fact

---

[5] The father's parental rights were also terminated and he has not appealed.

could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id.* However, this does not mean that we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

When reviewing a factual sufficiency challenge under the clear and convincing burden, the analysis is somewhat different in that we must consider all of the evidence equally, both disputed and undisputed. *Id.* In reviewing the evidence for factual sufficiency, we give due deference to the fact finder's findings; we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003) (explaining that in a termination case, an appellate court should not reweigh disputed evidence or evidence that depends on a witness's credibility). We must consider whether the evidence is sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *In re C.H.*, 89 S.W.3d at 26. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so

significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the Department must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of section 161.001 and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

### III. ANALYSIS

In three issues, the Mother argues the evidence is legally and factually insufficient to support the trial court's findings that (1) she knowingly placed or knowingly allowed the Child to remain in conditions or surroundings which endangered her physical or emotional well-being; (2) she engaged in conduct or knowingly placed the Child with persons who engaged in conduct that endangered her physical or emotional well-being; and (3) termination was in the best interest of the Child. *See* Tex. Fam. Code §§ 161.001(1)(D), (E), and 161.001(2).

### A. ENDANGERMENT

We now address the Mother's first two issues and review the evidence supporting the trial court's findings under Section 161.001(1). Both subsections D and E use the term "endanger." In this context, endanger means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *A.S. v. Tex. Dep't of Fam. & Prot. Servs.*, 394 S.W.3d 703, 711 (Tex. App.—El Paso 2012, no pet.). Subsection D concerns the child's living environment, rather than the parent's conduct, though parental conduct is certainly relevant to the child's environment. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Although the parent need not

12

have certain knowledge that an actual injury is occurring, the parent must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Under subsection E, the cause of the endangerment must be the direct result of the parent's conduct, including acts, omissions, and failures to act, and the requirements of the subsection may be satisfied by showing the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *In re U.P.*, 105 S.W.3d 222, 233 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Because the evidence pertaining to subsections D and E is interrelated, we may conduct a consolidated review. *See In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.).

The Department provided expert testimony to show that the Child's injuries were intentionally inflicted and they are consistent with physical abuse having occurred on more than one occasion. The medical records show two fractures inflicted at different times. The expert testimony further established that a five-year-old could not have caused the injuries. In addition, subsequent testing ruled out a genetic bone disorder. A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause, and supports termination under subsection D. *In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005); *see also C.H. v. Tex. Dep't. of Fam. & Prot. Servs.*, 389 S.W.3d 534, 541 (Tex. App.—El Paso 2012, no pet.) (finding sufficient evidence under subsection D where child's broken bones were not explained).

The evidence in the record is that the Mother was the Child's sole caregiver. The Mother herself testified the Child was never out of her care. Other evidence reflects that the Mother was generally alone with the Child, and that the Sister and a brother stayed with their grandparents most of the time. The evidence also reflects that only the Mother and the Sister were present during the time-frame the

13

arm injury occurred. When interviewed at the hospital, the Mother explained that only she, the Child, and the Sister were home the night she discovered the baby's injured arm.

The Department's conservatorship caseworker, Ms. Ransom, testified that she was assigned the case in January 2013. She testified she spoke to the Mother once a month during the pendency of the case and continued to ask her if anyone else could have injured the Child. The Mother did not identify anyone other than her five-year-old who could have caused the injuries. The Mother never told Ransom that she had left the Child with her mother on Thanksgiving, as the Mother had claimed in her trial testimony.

The Mother's description of the events surrounding the Child's arm injury and her theories about the leg injury were inconsistent. At first, she had no idea how the injury could have happened. She later stated the Sister tried to pick up the Child by the arm. She told one of the doctors that the Sister grabbed the Child when she started choking after the Sister fed her a bottle. She indicated that the Child's leg injury could have occurred the night before Thanksgiving at the Grandmother's home. The Mother also later claimed to have heard the Child make a noise while in the back seat of the car with the Sister, suggesting the Sister may have hurt the Child's leg. She also said the Sister had tried to take the Child out of the bassinette and played with her like a doll. She reported to one of the doctors that the Sister was jealous of the Child, indicating the Sister may have purposefully hurt the Child.

The Mother also denied ever hearing the Child cry or scream as a result of her broken arm, despite the medical testimony that any child would have screamed after such an injury. Tavarez testified that during her investigation, she visited the Mother's apartment. She described it as small. The kitchen and living room share a wall with an open doorway. Despite the small apartment, the Mother testified she

14

never heard the Child cry at the time the injury to her arm was supposed to have occurred, explaining that the Child was the type of baby who "did not cry." The Child's medical records reflected that she later cried when her injured arm was being examined.

Contrary to the Mother's claim at trial, Dr. Sarpong testified that he never stated that the only kind of abuse which could have caused the Child's injuries was "shaken baby syndrome." He explained that the term had been used in the past "to describe bleeding in the brain, retinal hemorrhages," but the term has been abandoned, and he now uses terms like "non-accidental injuries" or "child physical abuse." He stated that the shaking he described as causing the Child's leg fracture was not the type formerly referred to as "shaken baby syndrome." He further explained that the Child's negative retinal exam, showing no hemorrhages, did not change his opinion of what caused the injuries.

The Supreme Court of Texas in *In re J.P.B.* reviewed similar evidence of physical abuse, including that the father was with the mother and child every day during the period the fractures likely occurred, the child sustained multiple fractures when under the father's care, and the fractures were likely caused by abuse and did not occur all at once. 180 S.W.3d at 574. Based on this evidence, the Court found the evidence was legally sufficient to allow the jury to reasonably infer that, although the father sought medical care, he knowingly allowed the child to remain in an environment that endangered his physical well-being as required under subsection D. *Id.* The court also held that it was within the fact finder's province to judge the father's demeanor and to disbelieve his testimony that he did not know how the child was injured. *Id.*

Similarly, in *In re C.H.*, the parents took the child to the hospital, where it was discovered he had a broken leg, but the parents claimed the leg simply "popped" during a diaper change. 389 S.W.3d at 541. X-rays showed the child had

15

suffered broken ribs, a prior fracture of the other leg, and the breaks were in various stages of healing. *Id*. The parents denied knowledge of the other injuries or how they occurred, tests ruled out brittle bone disease or any other such condition, and the child sustained no more broken bones while in foster care. *Id*. The El Paso Court of Appeals found the evidence legally and factually sufficient to support termination under subsection D. *Id.* The court explained that the trial court was not required to believe the mother's testimony that she was unaware of the injuries and did not know how they occurred. *Id*.

As with *In re J.P.B.* and *In re C.H.*, the trial court as fact finder in this case was free to make its own credibility assessments, resolve conflicts in the testimony, and decide what weight to give the witnesses' testimony. *See In re J.L.*, 163 S.W.3d at 86–87 (fact finder is the "sole arbiter when assessing the credibility and demeanor of witnesses"). Thus, the trial court could credit the expert medical testimony that a five-year-old was not capable of causing the injuries to the Child, and the injuries resulted from abuse. The trial court was not required to believe the Mother's testimony that she was unaware of the injury until shown the x-ray at the hospital. The trial court was also not required to believe the Sister's testimony. The Sister acknowledged that she was afraid her mother would be returned to jail after the Child's injury.

In light of the evidence in this case that the Child sustained an arm fracture and a leg fracture at different times while in the Mother's care, the injuries were not accidental, but instead were abusive injuries caused by extreme force, and the Child would have screamed in pain so that her caregiver should have been aware of the arm fracture, the trial court could have reasonably inferred that the Mother knowingly allowed the Child to remain in an environment that endangered her physical well-being and that she engaged in conduct that endangered her physical well-being. It was within the trial court's province to judge the Mother's

16

demeanor, to disbelieve her testimony that she did not know how the Child was injured, and to infer that she knew of the Child's injuries and how they occurred, supporting its findings under subsections D and E.

After reviewing all of the evidence, we conclude that the disputed evidence is not so significant that a reasonable trier of fact could not have formed a firm belief or conviction that the findings under subsections D and E are true. *See In re J.F.C.*, 96 S.W.3d at 266. After applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's findings under subsections D and E. *See* Tex. Fam. Code §§ 161.001(1)(D), (E). Accordingly, we overrule the Mother's first and second issues.

## B. BEST INTEREST

In her third issue, the Mother asserts the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the Child's best interest. *See* Tex. Fam. Code § 161.001(2).

There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent, and the burden is on the Department to rebut that presumption. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). In reviewing the sufficiency of the evidence to support a finding that termination is in the child's best interest, a court examines several factors, including (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing

17

parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). This list is not exhaustive, and evidence is not required on all nine factors to support a best interest finding. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

For cases in which the Department or another government agency is the petitioner, section 263.307(a) of the Texas Family Code provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code § 263.307(a). Section 263.307(b) lists the factors to consider in determining whether a parent is "willing to provide the child with a safe environment." *Id.* § 263.307(b). Those factors include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally

adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id*. With these considerations in mind, we review the evidence below.

### *The Desires of the Child*

At the time of trial, the Child was only fourteen months old. When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.); *In re U.P.*, 105 S.W.3d at 230.

The evidence at trial was that the Child was well-cared for by her foster family. In contrast, the Mother had not seen the Child in almost a year. The Mother acknowledged that she only had two visits with the Child since the Child was removed from her care in December 2012. The last visit the Mother had with the Child was in January 2013, before the trial court ended her visitation.

Ms. Ransom testified that in her monthly contact with the Mother, she told the Mother how the Child was doing. Ransom related that the Mother has asked for pictures of the Child and seemed interested in her. The Mother testified that the baby "screamed" and "clutched" her shirt when she put her down at the end of her last visit in January 2013. This evidence contrary to the trial court's finding, however, is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that termination of the Mother's parental rights is in the

19

Child's best interest.

### *Present and Future Emotional and Physical Needs of the Child*

Regarding this factor, we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *See In re D.R.A.*, 374 S.W.3d at 533. The goal of establishing a stable, permanent home for a child is a compelling government interest. *Id.*

The evidence supporting the trial court's finding relevant to this factor is that the Child has been placed in her current foster home for most of her life, since she was two months old. The Department provided evidence the Child's foster home is safe and provides for all the Child's needs. The plan is for the foster parent to adopt the Child.

The evidence is undisputed that while in the Mother's care, the Child suffered broken bones requiring hospitalization. A fact finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future. *See Castorena v. Tex. Dep't of Prot. & Reg. Servs.*, No. 03-02-00653-CV, 2004 WL 903906, at *10 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.).

### *Present and Future Emotional and Physical Danger to the Child*

The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the child. *In re C.H.,* 89 S.W.3d at 28; *In re D.R.A.*, 374 S.W.3d at 533. Specifically, the court was permitted to consider the evidence of physical abuse recited above. A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In re D.L.N.*, 958 S.W.2d 934, 934 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d at 267.

In addition to the abuse evidence previously described, the Mother also conceded that she was convicted in 2011 of possession of marijuana. She acknowledged she spent time in jail as a result of the conviction. The Sister stated that she was afraid the Mother would be put in jail the night the Child was hospitalized because "[s]ometimes" the Mother was sent to jail. *See In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (recognizing a parent's criminal history including incarceration, though not dispositive, is a factor that may be considered in determining the best interest of a child).

The Mother provided evidence that the Child appeared well-cared for other than the broken bones. At her two-month check-up, the Child appeared healthy and happy. This evidence against the trial court's finding that termination is in the Child's best interest, however, is not so great that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *See In re J.F.C.*, 96 S.W.3d at 266.

### *Parenting Ability*

A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest. *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). The Mother was unemployed before the Department filed suit, and she lacked employment and her own housing to provide for the Child's needs at the time of trial. She was last employed in October 2013, but she worked for only three or four months in that job.

The Mother testified that she had three children, and at the time of trial, she was pregnant with a fourth child. She testified that her children have different

21

fathers. Her son and the Sister had been living with the Mother's father for about a year at the time of trial. The trial court may have considered the Mother's failure to care for her other children in evaluating her parenting abilities. A parent's failure to show that she is stable enough to parent a child for any prolonged period entitles the trial court "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.).

A fact finder may measure a parent's future conduct by her past conduct and determine that it is in a child's best interest to terminate her parental rights. *Castorena,* 2004 WL 903906, at *10. Although evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, the fact finder may permissibly infer that a parent's future conduct may be measured by recent past conduct as it relates to the same or a similar situation. *See In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.). As recited above, the evidence shows the Child was the victim of child abuse, resulting in non-accidental fractures, while in the Mother's care. She blamed her five-year-old daughter despite unequivocal medical testimony disputing that possibility. The Mother was convicted of drug possession and has been jailed in the past. The Sister was afraid the Mother would be put in jail the night the Child was hospitalized. The trial court properly could infer that the Mother's endangering conduct that resulted in the Child's broken bones might recur in the future if the Child was returned to her.

### *The Plans for the Child by the Individuals or Agency Seeking Custody*
### *The Stability of the Home or Proposed Placement*

The fact finder may compare the contrasting plans for a child by the parent and the Department and consider whether the plans and expectations of each party

are realistic or weak and ill-defined. *D.O.*, 851 S.W.2d at 356. The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest. *See J.N.R.,* 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Stability and permanence are paramount in the upbringing of children. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).

The Mother testified that she had lived with the Grandmother since April or May 2013, and admitted, "I don't pay for anything right now." If the Child were returned to the Mother, the plan was to live with the Grandmother for some period of time. The Mother conceded that the Grandmother has had Department cases, although she had earlier denied knowing about her mother's history. Evidence showed the Grandmother had been investigated by CPS at least three times in the past three or four years. The Grandmother acknowledged that some of her children had been removed from her home, but they were eventually returned without termination of her parental rights.

The Mother claimed, "When I get [the Child] back [the Child] is going to be in daycare. That's very important." She also claimed the Child would be clean and clothed and fed because her children are her "first priority." The Mother said that having the Child in a safe environment would be her "top priority," and claimed she "would use all the support that I have to make sure this never happens again, ever." The Grandmother stated that she would be a support system for her daughter and the Mother would live with her until she obtained an apartment. The trial court may have discounted the Mother's testimony about her plans for the Child and determined they were unrealistic in light of the testimony that the Mother was unable to maintain employment or independent housing. *See In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied) (the fact finder is free to reject parent's assertions of future stability and of having learned from her

23

mistakes).

Moreover, there is little evidence in the record that the Mother had an adequate support system. The Grandmother confirmed that she did not request and was not considered for placement of the Child based on her history with the Department. The trial court could reasonably have determined it was not in the Child's best interest to live with her Grandmother because of this history. The Mother identified relatives for possible placement of the Child, but they were eliminated from consideration. The Child could not be placed with her great-grandmother because her husband had a murder conviction. The great-grandmother's sister did not pass a home inspection.

Evidence supporting the trial court's best interest finding reflects that the Child has been placed in her current foster home since she was released from the hospital in December 2012. Ransom testified that she has visited the Child at least once a month while the case has been pending. She testified that the Child's foster home is safe and provides for all the Child's needs. The Child has not suffered any injuries during her foster placement. The Department's plan is for the Child's foster parent to adopt her if the Mother's parental rights are terminated. Ransom testified that termination is in the Child's best interest. She further testified the Child would be at risk if she were returned to the Mother.

Based upon the evidence in the entire record, a fact finder could reasonably conclude that the Child's best interest would be better served through the Department's plan for her to be adopted. *See In re C.H.*, 89 S.W.3d at 28 (noting evidence about placement plans and adoption are relevant to best interest but must be considered in context of entire record).

### *Acts or Omissions of the Parent Which May Indicate that the Existing Parent-Child Relationship Is Not a Proper One*

24

As discussed, while in the Mother's sole care, the evidence reflects that the Child was the victim of physical abuse and suffered non-accidental broken bones. The Mother subjected the Child to uncertainty and instability by failing to maintain stable housing and employment during pendency of the case. Additionally, she had not obtained independent housing or employment to provide for the Child's needs at the time of trial. The Mother continued to blame her five-year-old child, despite unequivocal medical testimony to the contrary. Further, the Mother has been convicted for drug possession and jailed on more than one occasion, also subjecting the Child to uncertainty and instability. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with his family service plan support a finding that termination is in the best interest of the child.").

### *Other Factors*

Due to the child's young age, there is no record evidence relevant to some of the statutory factors that have not already been discussed. However, the court may have considered the seriousness of the injuries to the Child and the Child's vulnerability because of her tender age. *See* Tex. Fam. Code § 263.307(b)(1), (3). Although the court was not required to order a family service plan, there is no evidence that the Mother otherwise sought out any counselling or other services. *See id.* at (b)(10). There is likewise no evidence of the steps the Mother may have taken to seek employment or obtain her own residence. *See id.* at (b)(11).

In sum, considering the relevant factors under the appropriate standards of review, we hold that the evidence presented at trial and summarized above is legally and factually sufficient to support the trial court's finding by clear and convincing evidence that termination of the parent-child relationship between the Mother and the Child is in the Child's best interest. *See* Tex. Fam. Code § 106.001(2); *Holley*, 544 S.W.2d at 371–72. We overrule the Mother's third issue.

## IV. CONCLUSION

Having determined the evidence is legally and factually sufficient to support termination of the Mother's parental rights, we order the judgment of the trial court affirmed.


/s/    Martha Hill Jamison
       Justice


Panel consists of Justices Christopher, Jamison, and McCally.