# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00336-CV

---

### J. M. III and T. R., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 23DFAM337463, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

J.M. III (Father) and T.R. (Mother) appeal the trial court's Decree of Termination, which terminates their parental rights to their four children—an oldest daughter, two younger sons, and an infant son. Father challenges only the finding made against him under the statutory best-interest requirement, arguing that the evidence was legally and factually insufficient to support it.[1] *See* Tex. Fam. Code § 161.001(b)(2). In contrast, Mother's attorney on appeal has filed an *Anders* brief, concluding that Mother's appeal is frivolous and without merit. *See Anders v. California*, 386 U.S. 738, 744 (1967); *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeal from judgment terminating parental rights).

---

[1] He does not challenge the findings made against him under the four statutory predicate grounds Paragraphs (D), (E), (N), and (O). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O). Those findings are thus binding in this appeal and can support the challenged best-interest finding. *See A.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00054-CV, 2023 WL 4424848, at *3 (Tex. App.—Austin July 11, 2023, no pet.) (mem. op.).

Because the evidence was legally and factually sufficient to support the best-interest finding made against Father, we overrule his sole issue. As for Mother, her *Anders* brief meets the necessary requirements by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regul. Servs.*, 160 S.W.3d 641, 646–47 (Tex. App.—Austin 2005, pet. denied). We thus affirm the trial court's Decree.

## BACKGROUND

The children were removed for their protection in an emergency from Father and Mother's home in early 2023 due to the condition of the home, the older children testing positive for methamphetamine, and the youngest child testing positive for methamphetamine at birth. They were placed by the Department in separate foster placements—the oldest daughter in one, the two younger sons together in another, and the infant son in a third because of concerns about the children's needs. The Department developed Family Service Plans for each parent setting forth the Department's requests for steps to be taken by the parents before the children would be returned to their care, and the trial court made those Plans orders of the court. Each parent's Plan, for example, required regular drug-testing. And the Department required a number of consecutive negative drug-test results before the Department would let the parents visit the children.

The Department's claims to terminate the parent's rights were tried to the bench beginning in January 2024 and continuing in February and March 2024. By that time, the children ranged in age from one year to six and a half. The witnesses for the Department included its caseworker, the daughter's counselor, and a Department investigator. Father put on a case-in-chief and testified. After the evidence closed and the trial court heard the guardian *ad litem*'s

recommendation, the court signed its Decree of Termination terminating Father's and Mother's parental rights to the children. Both parents now appeal.

## FATHER'S APPEAL

Father's sole appellate issue is a challenge to the legal and factual sufficiency of the evidence supporting the best-interest finding made against him. To terminate parental rights, the Department must prove one of the statutory predicate grounds and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). It must prove both elements by clear and convincing evidence. *See* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

Legal-sufficiency review of the evidence to support termination requires reviewing all the evidence in the light most favorable to the finding under attack, and considering undisputed contrary evidence, to decide whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* When reviewing the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness

3

testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

When reviewing best-interest findings, courts consider factors like (1) the child's wishes, (2) the child's emotional and physical needs now and in the future, (3) emotional or physical danger to the child now and in the future, (4) the parenting abilities of the parties seeking custody, (5) programs available to help those parties, (6) plans for the child by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's conduct that may indicate that the existing parent–child relationship is improper, and (9) any excuses for the parent's conduct. *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). This list is not exhaustive, not all factors need be proven to determine best interest, and proof of only one factor may in a particular factual context support termination. *See M.L. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00541-CV, 2023 WL 2025710, at *5 (Tex. App.—Austin Feb. 16, 2023, no pet.) (mem. op.); *S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at *16 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.). Evidence probative under the statutory predicate grounds may also be probative of best interest. *A.C.*, 560 S.W.3d at 631–32.

We begin by noting that because Father has not challenged the predicate-ground findings against him under Paragraphs (D), (E), (N), and (O), those findings are binding in this appeal and may support the best-interest finding.[2] *See A.B. v. Texas Dep't of Fam. & Protective*

---

[2] Those Paragraphs provide that parental rights may be terminated if the parent has:

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

*Servs.*, No. 03-23-00054-CV, 2023 WL 4424848, at *3 (Tex. App.—Austin July 11, 2023, no pet.) (mem. op.); *In re A.K.*, 487 S.W.3d 679, 688 (Tex. App.—San Antonio 2016, pet. denied). Especially probative of best interest are the endangerment findings, Paragraphs (D) and (E).[3]

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

. . . .

(N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:

(i) the department has made reasonable efforts to return the child to the parent;

(ii) the parent has not regularly visited or maintained significant contact with the child; and

(iii) the parent has demonstrated an inability to provide the child with a safe environment; [or]

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O).

[3] This is why we reject Father's argument on appeal that "[t]here was no evidence . . . that showed continuing the parent child relationship . . . presented a danger that would warrant forever preventing any kind of relationship with them." We are bound by the unchallenged endangerment findings, and the factfinder may reasonably infer from past endangering conduct or past inability to meet a child's needs that returning the child to such a parent would again entail endangerment or inability to meet needs. *See In re J.I.G.*, No. 01-18-00023-CV, 2018 WL 3233874, at *10 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.); *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

The evidence showed Father to be unable to provide the children with a stable—or even a safe—home life. *See In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at \*9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) (evidence of parent's failure to provide stability for prolonged period allowed factfinder to infer that same pattern would likely continue and that permanency could be achieved only through terminating parental rights and adoption by another). When the Department first removed the children from the parents' care, the condition of the home was, according to the Department's caseworker, "pretty bad" and unlivable for children. It had holes in the walls; dirty toilet tissue was in the bathtub, preventing its use; duct tape covered the oven door and several windows; rotten food clogged the sink; there were noticeable odors of urine and marijuana; and a closet door was tied to its room's exit door. The cord tied to the closet door was, according to a Department worker's affidavit, used to keep the children "in the room so they couldn't get out." The worker also swore that the parents "have displayed a blatant disregard for their children's safety by engaging in excessive domestic violence while the children were present, living in an unsafe home, and fleeing from CPS for 21 days."

The children often were left home alone. Department personnel when visiting the home sometimes heard the children "crying inside the front door." The caseworker said that they would be "left for days and days alone to the point to where the children had to leave to wander to get food, and there was no food." During one such episode, one of the older boys ate dirt.

The parents eventually were evicted from the home and lived in a series of hotel rooms or out of their car. Through the final trial in the case, Father lacked suitable housing for four children, continuing to live with Mother in a one-bedroom, one-bathroom hotel room that lacked items for the children. Father was inconsistently employed throughout the case, causing Department personnel concern about whether he could support the children financially, and did

6

not have a job when the final trial began.[4]  Even after he found a job at a convenience store, his work hours were less than full-time, and a comparison of his income to his expenses cast doubt on whether he could support the children.  The caseworker testified that neither parent has provided gifts, food, diapers, or clothing for the children in the months leading to the final trial.[5]  Father admitted that he cannot provide a home for all the children, and the caseworker agreed that the hotel room was not enough.  Father also admitted that he has no plan for caring for the youngest two children, the older of whom is nonverbal, has special needs presumed to be related to autism, and has suffered developmental delays.

As for the oldest daughter, she has made an outcry of sexual abuse committed against her by Mother, yet Father has continued to live with Mother.  In February 2024, after a phone call with the parents, the oldest daughter reported that Mother had touched her private parts and chest.  The child made the same report during a later forensic interview at a children's advocacy center, and Department personnel have concluded that there is reason to believe the allegations.  Also during the forensic interview, the child said that Father had seen some of the sexual abuse occurring and even though he told Mother to stop, he just walked out of the room.

---

[4] Family Code section 161.001(c)(2) does not prohibit the Department from offering evidence of financial inability to care for multiple children, and a best-interest finding against a parent is supportable even when the evidence shows that the parent is economically disadvantaged when the evidence also shows other reasons supporting the best-interest finding, such as illegal-drug use and domestic violence.  *See In re A.F.*, No. 10-19-00335-CV, 2020 WL 1313450, at *19 (Tex. App.—Waco Mar. 19, 2020, no pet.) (mem. op.); *In re J.D.-V.*, No. 04-18-00743-CV, 2019 WL 938290, at *3 (Tex. App.—San Antonio Feb. 27, 2019, pet. denied) (mem. op.).

[5] Father gave competing testimony, saying that he had provided gifts and diapers.  Yet the trial court, as factfinder, could resolve this evidentiary conflict against Father's position.  *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see also Smith v. McLin*, 632 S.W.2d 390, 392 (Tex. App.—Austin 1982, writ ref'd n.r.e.) (factfinder need not accept truth or accuracy of testimony by parent who is subject of parental-rights-termination suit about parent's actions or intentions).

Partly because of the sexual-abuse allegations and the resulting pending case against Mother, the caseworker recommended not returning any of the children to Mother's care.[6] Father's testimony buttressed this concern—he testified that he would be willing to limit any access to the children by Mother if the court required it and that he would be willing to separate from Mother. And yet, Father was still living with Mother and planning to continue to live with Mother during and after the final trial in the case. The caseworker said that the children still have a lot of trauma "when it comes to their parents."

The oldest daughter in particular was put under significant strain by the parents. Her counselor testified that when first coming into his care, the daughter was "severely damaged" with "severe mother issues" and "serious problems," including difficulty making substantive human attachments. She presented as a "parentified child," expressing fear over being responsible for taking care of and feeding her siblings because she was often left alone with them by the parents. She has told the counselor that she "used to be 30 and now she's just 5 or 6," and the counselor testified that in their 11 months of therapy together, much of the therapy has focused on helping her learn to be a child again and to deal with feeling overwhelmed, rejected, or abandoned. She was not yet seven.

The children's lives have since markedly improved. In their separate foster placements, they were growing and thriving.[7] About the two older sons, the caseworker testified that their foster-to-adopt placement was creating a healthy bond with them. The older of the two

---

[6] Similarly, Mother's therapist recommended not returning the children to Mother because she continued to use drugs, lived in the hotel room, and needed inpatient drug rehab.

[7] They were separated partly because when one or more of them would see one another, they would urinate on themselves for days afterward and would have trouble sleeping.

had been overweight when first coming into Department care, but the foster placement saw to that need by keeping the child on a special diet. The younger of the two has developmental delays and is believed to have autism. His placement has given him access to therapy and treatment. The infant, according to the caseworker, also is in a healthy, foster-to-adopt placement, where the caregivers have developed a bond with him. The oldest daughter is in her own foster-to-adopt placement, which has helped her through needing to repeat kindergarten, and has formed a bond with the foster mother, whom the daughter refers to as "Mom."

On top of all this evidence, much of the Department's case against Father also involved evidence of his continuing drug use, causing Department personnel concern that he would continue to use drugs even if the children were returned to him. A parent's abuse of drugs is relevant under several of the *Holley* factors, especially when the drug use occurs while the case to terminate the parent's rights is pending. *See K.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-24-00247-CV, 2024 WL 3880031, at *4 (Tex. App.—Austin Aug. 21, 2024, no pet.) (mem. op.). Evidence of a parent's "drug use throughout the children's lives, . . . continued drug use during the case, and . . . history of instability" supports a best-interest finding against the parent. *See In re A.A.*, 670 S.W.3d 520, 534 (Tex. 2023).

The evidence here showed that Father tested positive for methamphetamine during the case, in May 2023, November 2023, and January 2024. *See K.H.*, 2024 WL 3880031, at *4 (methamphetamine use during case supported best-interest finding against parent). It also showed his testing positive for marijuana during the case, in April 2023, July 2023, September 2023, November 2023, and January 2024. He was recommended by a substance-abuse-screening service to attend meetings of a narcotics-abuse counseling group, but the Department was unaware of whether he ever attended any. On top of positive drug-test results, Father altogether missed several

9

Department-requested drug tests, including after the final trial had begun. It was reasonable for the trial court to infer that those missed tests would have been positives. *See T.D. v. Texas Dep't of Fam. & Protective Servs.*, 683 S.W.3d 901, 914 (Tex. App.—Austin 2024, no pet.).

Father admitted using methamphetamine in May 2023 and October 2023 and marijuana in February 2024. He also admitted that his drug use over time has led to a diagnosis of substance-induced psychotic disorder. The disorder has caused him to hear a voice that tells him to beat people.

His and Mother's drug use has affected the children.[8] It has kept the children apart from the parents because neither parent could provide the number of consecutive negative drug-test results requested by the Department and ordered by the trial court, and thus neither had visitations with the children for months during the case. Even though some of Father's drug use occurred while away from the children, he also, by his own admission, had used drugs while the children were in his care. *See A.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-23-00658-CV, 2024 WL 1587046, at *5 (Tex. App.—Austin Apr. 12, 2024, no pet.) (mem. op.) (parent's use of illegal drugs can still expose child to jeopardy even if use did not occur when child was around). The parents' drug use has even affected the children physically. The older two sons tested positive for methamphetamine, one of them also tested positive for marijuana, and the infant's meconium tested positive for methamphetamine and marijuana at birth. The parents' response to there being

---

[8] As to Mother's drug use, the evidence showed, among other things, that she (a) overdosed on methamphetamine in October 2023, leading to an arrest and a still-pending state-jail-felony charge for possession of a controlled substance; (b) either missed or tested positive for the majority of the Department-requested drug tests in the case; (c) tested positive for methamphetamine and amphetamine in September 2023; and (d) continued testing positive for marijuana and missing requested drug tests even after completing an outpatient-rehab program.

drugs in the home with the children was to say, according to the caseworker, "People make mistakes." Father continued to live with Mother through the final trial.

Of course, Father takes a different view of the evidence. He advances five arguments, but none persuades us that the trial court's Decree should be reversed.

*First*, he says that there was no evidence showing the desires-of-the-children *Holley* factor. But "[w]hen children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Though the three sons were too young to express their desires, they had bonded with their foster families, were well cared for by them, and had spent minimal time with Father. As for the oldest daughter, when her counselor worked with her to depict on a diagram the people whom she felt closest with, Mother was not in the picture at all, and Father was at the furthest-away level of attachment. In the same exercise, the daughter put the foster mother at the center of the child's attachments. Additionally, the parents' lack of visitations can be considered under the desires-of-the-child factor because the resulting bonding with foster parents and simultaneous lack of bonding with the parent are relevant. *See In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *15 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.).

*Second*, Father argues that there was no evidence that he could not meet the children's needs or that the foster placements were doing anything advanced to meet the children's needs. On the contrary, Father admitted to not having a plan to care for the youngest two sons and did so in the context of questioning about those children's needs, for example, to be taken to various appointments and to see certain therapeutic professionals. The trial court reasonably could have inferred from the evidence that Father's admission meant an inability to meet the

11

children's needs. But even without this testimony, and assuming for the moment, but not deciding, that Father's argument is correct, the children's needs are only one of the *Holley* factors, *see* 544 S.W.2d at 371–72, and the Department need not prove all factors when seeking to terminate parental rights, *see M.L.*, 2023 WL 2025710, at *5; *S.C.*, 2020 WL 3892796, at *16.

*Third*, Father asserts that there is no evidence of the foster placements' commitment to keep the children in contact with one another, contrasting with Father's wish for all the children to return to his care. But there was testimony allowing the factfinder to decide that frequent contact among the children would not be in their best interest. The caseworker testified that the children have needed therapy for issues that arise "whenever they either speak to or—speak to their parents or visit their sibling." It was in this context that the caseworker pointed out that when the children would see one another, they would often for days afterward have trouble with urinating on themselves or with sleeping.

*Fourth*, Father asserts that there was no evidence of the foster placements' plans for the children. But the children's placement in foster-to-adopt homes is at least some evidence that the placements were willing to adopt the children. Plus, this and the other *Holley* factors focus on stability and permanence for children and allow for comparisons between the subject parent's and Department's plans. *See J.D.*, 436 S.W.3d at 120 (stating, in analysis under "plans" *Holley* factor: "The fact finder may compare the contrasting plans for a child by the parent and the Department and consider whether the plans and expectations of each party are realistic or weak and ill-defined. The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest. Stability and permanence are paramount in the upbringing of children." (internal citations omitted)). Under such a comparison here, Father's plans were at best ill-defined, and they were admittedly

12

nonexistent regarding the youngest two children. By contrast, each child was happy and healthy in their placement, experiencing positive care and growing bonds with their caregivers.

*Fifth*, Father points to evidence showing his progress—he has harnessed community resources to help find employment and housing and has engaged in therapy and parenting classes. However, we conclude under the applicable legal- and factual-sufficiency standards that the evidence as a whole allowed the trial court to form a firm belief or conclusion about the best-interest finding against Father. We thus overrule his sole issue.

## MOTHER'S APPEAL—*ANDERS* BRIEF

In connection with the *Anders* brief that Mother's appellate attorney has filed, the attorney has certified to this Court that he has provided Mother with a copy of the brief. To date, Mother has not filed a *pro se* brief. The Department has a filed a response stating that it will not file a brief regarding Mother's appeal unless requested by this Court.

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. We have conducted an independent review of the entire record, including the *Anders* brief submitted on Mother's behalf, and have found nothing in the record that might arguably support an appeal. Our review included the trial court's endangerment findings against Mother under Paragraphs (D) and (E), and we have found no nonfrivolous issues that could be raised on appeal with respect to those findings. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam). We agree that Mother's appeal is frivolous and without merit.

**CONCLUSION**

We affirm the trial court's Decree of Termination. Mother's counsel's motion to withdraw is denied.[9]

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: November 15, 2024

---

[9] The Supreme Court of Texas has held that the right to counsel in suits seeking the termination of parental rights extends to "all proceedings [in that Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam). Accordingly, counsel's obligation to Mother has not yet been discharged. *See id.* If after consulting with counsel, Mother desires to petition for review, her counsel should timely file with the Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *See id.* at 27–28.

14