

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00414-CV

_____

IN THE INTEREST OF C.W., A CHILD

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-726200-22

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant, the father of C.W. (Father), appeals from a judgment terminating his parent–child relationship with C.W.[1]  In three issues, Father challenges the legal and factual sufficiency of the evidence supporting the two endangerment predicate conduct grounds found by the trial court and the evidence supporting the legal and factual sufficiency of the trial court's best-interest finding.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E), (b)(2).  We affirm.

## II. BACKGROUND[2]

Mother and C.W. tested positive for methadone and marijuana when Mother gave birth in June 2020.[3]  Father—a registered sex offender—was at the hospital when C.W. was born, and even though the Department of Family and Protective Services (the Department) opened an investigation, Mother and Father were allowed to take C.W. to the home they shared.  According to Father, the three received Family-Based Safety Services from the Department until Mother took C.W. away from him.  While the family was still living together, the Department had opened

---

[1]C.W.'s mother (Mother) did not appeal the trial court's judgment, which also terminated her parent–child relationship with C.W.

[2]We present a general summary here and include a more detailed factual discussion in our analysis of Father's issues.

[3]When C.W. was born, Father was fifty-nine years old and Mother was twenty-seven.

2

another investigation but lost contact with Mother. Mother and C.W. were placed on the Department's Child Safety Check Alert List (CSCAL), which is "a list of children who were referred to[,] or the[ir] families were reported to[,] CPS or CPI, [who] either lost contact with them or could not find them."[4]

In late May 2022, the month before C.W.'s second birthday, police officers encountered Mother walking with C.W.[5] down the side of the access road or shoulder of a highway in Dallas County. The police contacted the Department. Mother told the Department investigator who interviewed her that she had been walking down the road in an attempt to reach her drug treatment classes. Mother said that she had gone to inpatient rehab in mid-March 2022, had stayed for sixty-five days, and was discharged successfully. After her discharge, she had gone to a shelter but was kicked out for being on methadone treatment.[6]

---

[4]CPI, or Child Protective Investigations, "examines reports of child abuse or neglect to determine if any child in the family has been abused or neglected." https://www.dfps.texas.gov/Investigations/default.asp. CPS, or Child Protective Services, provides in-home services to children and families and foster care. *See* https://www.dfps.texas.gov/Child_Protection/; *see also In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 (Tex. App.—Fort Worth Oct. 21, 2021, pets. denied) (mem. op.) (noting that Our Community Our Kids (OCOK) provides these services in Tarrant County).

[5]Mother had been "push[ing]" C.W. Although no witness expressly said so, the context of the evidence suggests that C.W. was in a stroller.

[6]It is unclear where C.W. was living while Mother was in rehab or how he came to be in Mother's possession in late May 2022. Father later told his psychologist that Mother had "snuck into the home and took [C.W.] away."

Mother told the Department investigator that she had been "in a domestic violence relationship" with Father, who had "threatened her several times[; had] attempted to hit her with [a] car[;] . . . and [had] throw[n] things, such as wrenches and other tools, at her." Mother also said that Father "was very aggressive towards her; that he would hit her and tie her with ropes; . . . and [that he had] . . . threaten[ed] to kill her family members if they did not tell him where she was."

Mother memorialized these allegations in an affidavit that was notarized and later admitted into evidence at the termination trial. In the affidavit, Mother stated that she wanted C.W. to be placed in "temperantly custod[y]" [sic] because she was scared for his safety, as well as her own. Mother wrote, Father "wants me dead [and] is not afraid to go back to prison for murdering me[;] next time he sees me he will put a bullet through my head." According to Mother's statement, Father had tried to hit her with a wrench and hammer to prevent her from leaving the home with C.W., broke her phone to prevent her from calling the police, convinced her to drink alcohol until she blacked out, forced her to shave his body so that he could pass a hair follicle test, and tried to run her over and kill her "for kidnapping his son." Mother wrote that the house they had lived in was full of bed bugs and that Father was a hoarder. She also opined that Father wanted her dead so that he could get full custody of C.W.

C.W. was removed from Mother's custody and placed in foster care. Although the Department investigator called Father at least twice in the couple of days after the

4

removal, he could not reach Father. Dallas County CPS staff worked on the case until January 2023, when the case was transferred to Tarrant County and OCOK took over conservatorship services.

While the case was pending, Mother struggled with relapses and was in and out of rehab. She attended visits with C.W. only sporadically. Father completed many court-ordered services and consistently visited C.W., but he never allowed the Department to confirm the condition of his home, never acknowledged his role in the circumstances that led to C.W.'s being found by the side of the road with Mother, tried to get Mother to recant her statements about his being abusive, continued to enable Mother's drug use, thwarted the Department's attempts to contact her, and never showed the ability to provide C.W. with a stable home. The Department ultimately chose to seek termination of the parent–child relationship between C.W. and his parents.

After a trial to the court, the trial court found that Father had endangered C.W. pursuant to Subsections (D) and (E) of Family Code Section 161.001(b)(1) and that Father had in the past been convicted of aggravated sexual assault of a child. *See id.* § 161.001(b)(1)(D)–(E), (L). The trial court also found that termination of the parent–child relationship between Father and C.W. was in C.W.'s best interest. *See id.* § 161.001(b)(2). Father appealed.

5

## III. DISCUSSION

Father's first two issues in this appeal challenge the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings[7]: (1) that Father "knowingly placed or knowingly allowed [C.W.] to remain in conditions or surroundings which endanger[ed C.W.'s] physical or emotional well-being" and (2) that Father "engaged in conduct or knowingly placed [C.W.] with persons who engaged in conduct which endanger[ed C.W.'s] physical or emotional well-being." In his third issue, Father challenges the legal and factual sufficiency of the evidence to prove that termination of his parent–child relationship with C.W. is in C.W.'s best interest.

### A. Standard of Review

In a suit to terminate a parent–child relationship brought by the Department, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the

---

[7]Although the predicate conduct ground required to terminate the parent–child relationship was satisfied by the trial court's finding that Father has a past conviction for aggravated sexual assault—which Father does not challenge—we nevertheless review whether the evidence sufficiently supports the trial court's endangerment findings because they could have collateral consequences for Father. *See In re N.G.*, 577 S.W.3d 230, 234–36 (Tex. 2019).

6

allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545. The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

If we determine that no reasonable factfinder could form a firm belief or conviction that the Department proved the challenged finding, then the evidence is legally insufficient. *J.F.C.*, 96 S.W.3d at 266.

When determining whether the evidence supporting the termination of a parent–child relationship is factually sufficient, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our

7

own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the challenged finding. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Applicable Law

Here, the trial court found that Father had endangered C.W. pursuant to Subsections (D) and (E) of Family Code Section 161.001(b)(1). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E). To endanger a child in accordance with the statute means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *In re G.F.*, No. 02-21-00267-CV, 2022 WL 524138, at *3 (Tex. App.—Fort Worth Feb. 22, 2022, pet. denied) (mem. op.).

Under Subsection 161.001(b)(1)(D), we examine evidence about the child's environment to determine if the environment caused the physical or emotional endangerment. *Id.* For example, a parent's conduct in the home—such as illegal drug use or drug-related criminal activity—can create an environment that endangers a child's physical and emotional well-being. *Id.* Under Subsection 161.001(b)(1)(E), we ask whether evidence shows that the parent's conduct directly resulted in the child's endangerment. *Id.* The behavior must constitute a voluntary, deliberate, and conscious course of conduct but need not be directed at the child; we may infer the

8

specific danger to the child's well-being from the parental misconduct alone. *Id.* Courts may consider conduct that occurred outside the child's presence or after the child's removal by the Department. *In re C.L.-F.*, No. 02-22-00021-CV, 2022 WL 2353091, at *2 (Tex. App.—Fort Worth June 30, 2022, no pet.) (mem. op.). "Generally, conduct that subjects a child to a life of uncertainty and instability endangers the [child's] physical and emotional well-being . . . ." *In re B.K.*, No. 02-21-00175-CV, 2021 WL 5848769, at *8 (Tex. App.—Fort Worth Dec. 9, 2021, pet. denied) (mem. op.).

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). And evidence probative of a Subsection (b)(1) ground may also be probative of best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). In reviewing best-interest evidence, we consider nonexclusive factors that the factfinder may apply:

• the child's desires;

• the child's current and future emotional and physical needs;

• the current and future emotional and physical danger to the child;

• the parenting abilities of those seeking custody and programs available to assist them;

• the parties' plans for the child, including the stability of the proposed home or placement;

• the parent's acts or omissions suggesting that the existing parent–child relationship is inappropriate; and

• any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

## C. Application

### 1. Endangerment

As previously noted, the trial court found, pursuant to Subsection (L) of Family Code Section 161.001(b)(1), that Father had "been convicted . . . under . . . Penal Code . . . Section 22.021 (aggravated sexual assault)," based on the evidence of his prior convictions for sexually assaulting his prepubescent stepdaughters. Thus, to terminate Father's parent–child relationship with C.W., the trial court did not have to find any other predicate conduct ground before determining whether termination of that relationship was in C.W.'s best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). But when a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *N.G.*, 577 S.W.3d at 235; *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (relying on *N.G.*); *In re Z.M.M.*, 577 S.W.3d 541, 543 (Tex. 2019) (relying on *N.G.*). Thus, we will address whether the evidence is legally and factually sufficient to prove at least one of the endangerment grounds. *See In re G.W.*, No. 02-22-00181-CV, 2022 WL 4545568, at *2 (Tex. App.—Fort Worth Sept. 29, 2022, pet. denied) (mem. op.).

10

### a. Circumstances at Time of Removal

The Department investigator who first interviewed Mother at the time of removal testified that C.W. appeared to be unkempt, and he was dirty. He did not have any shoes, and he "appeared to be hungry." Mother told the investigator that she had a history of drug use[8] and mental-health problems: "[s]evere depression, bipolar, anxiety, and PTSD."

### b. Department Case Management and Father's Admissions

A Dallas County CPS supervisor talked with both Father and Mother on September 19, 2022, almost four months after the removal. Mother told the supervisor that she was in drug treatment at that time but that she would not be clean on a drug test because "she was still using." Mother said that she had started using heroin again because C.W. was in foster care, but she opined that "she would be able to kick . . . her heroin addiction" if C.W. was placed with her. This statement concerned the CPS supervisor because "a person under the influence isn't completely competent."

Father told the supervisor, Mother "doesn't use in the home," which sounded to the supervisor as if "he acknowledge[d] her drug use, but [didn't have] any concerns with it." The CPS supervisor was concerned that Father was minimizing the effect of Mother's drug use and was another adult who did not "seem [to] have the

---

[8]Mother admitted that she had used heroin while pregnant with C.W.

protective capacity to ensure [C.W.'s] safety." Father reported to the Department that he was a registered sex offender.

While Dallas County CPS was still working on the case, Father completed a psychological evaluation. He told the psychologist that he had five children, two of whom were adults, "and possibly one more." In October 2022, two of those children—both under the age of two—were in foster care in Tennessee.[9] Father told the psychologist that in May 2022, the same month C.W. and Mother were found by the side of the road in Dallas County, his wife[10]—who was at that time pregnant with his youngest child—had an affair and left him,[11] taking their toddler to Tennessee with her.

---

[9]By the time of trial, the Tennessee case was closed, and the children were living with their maternal grandmother. According to Father, the Tennessee court did not terminate his parental rights to those children, but he did not have visitation with them. He later admitted that the trial court's order in that case prohibited him from having visitation with those children.

[10]Father's wife and Mother are not the same person, nor is Father's wife the mother of the stepdaughters he sexually assaulted. Father testified that he began his sexual relationship with his wife in 2020—the year C.W. was born—when she was twenty years old. According to Father, although "[t]he courts and the adoptive mother" alleged that his wife had cognitive delays, she "is very intelligent" and "as smart as she wants to be." He did admit that, "possibly," she was easily manipulated; he claimed to have "rescued her from an abusive relationship with her ex-boyfriend." Father was still married when his youngest child was born in Tennessee.

[11]It is unclear when Father and his wife married or where Father's then-pregnant wife and toddler were living before C.W.'s removal from Mother in Dallas County. Father's first child with his wife was born in May 2021, when C.W. was ten months old, and his second child with his wife was born a year later, almost a week after C.W.'s removal from Mother's custody in Dallas County.

12

Father explained to the psychologist how he met Mother: "[H]e [had] found [Mother] on the brink of death in a drug-infested area and took her into his home and helped her to get treatment at a methadone clinic." He acknowledged that Mother "had a history of heroin, crack cocaine, and methamphetamine use," and he asserted that she had "histrionic personality disorder[12] and . . . issues with anger control" and that "[s]he became physically aggressive when he would not give her money for drugs."[13] Father professed not to know that Mother was using heroin in February 2022, before C.W.'s removal, but he also said Mother was "engaging in prostitution" at that time.[14]

Father told the psychologist that he had smoked marijuana from ages thirteen through twenty-five and that he had stopped using it while in prison for the next

---

[12]According to the psychologist, people with histrionic personality disorder "are very attention seeking, [and] they may dress provocatively, engage in sexual behaviors with strangers, [and] always want to be the center of attention. Most of the behaviors are extreme and in – they'll do anything to receive attention or affection."

[13]The psychologist testified at trial that Father appeared to have "fathered children [with] women who have significant issues with drug use with the reported intention of helping them overcome their addictions, and it also appeared that by engaging in those relationships he enabled . . . the women by providing them the financial means to purchase drugs."

[14]Father reported these facts to the psychologist. It is unclear whether Father denied knowing about Mother's purported prostitution.

twenty-three years; however, in 2020—after he had completed parole[15]—he had started smoking it again recreationally.[16]

Based on Father's psychological testing, the psychologist made the following recommendations to the Department: (1) that C.W. "remain in foster care indefinitely and . . . that reunification was not advised at the time, given [Father's] history of drug use and the prior aggravated child sexual assault charge[s]"; (2) that Father "complete a psychiatric evaluation to rule out any additional disorders"; (3) that Father "participate in drug counseling to address his marijuana use"; (4) that Father undergo random drug testing; (5) that Father participate in anger management counseling; (6) that Father "participate in individual counseling to address family relational concerns, anger control issues, and his poor coping and problem-solving skills"; and (7) that Father continue taking parenting classes and follow his service plan.

Mother told the Dallas County CPS caseworker during the investigation "that she was willing to do whatever she needed to do to get [C.W.] back, whether it was with her or [Father], but she would not want him placed in the home with both of them together." Mother explained that when she and Father were together, the

[15]According to Father, he was initially released from confinement in 2018, but he had gone back to prison for a parole violation related to forgetting to charge his monitoring device.

[16]Although Father claimed to have completed court-ordered drug counseling by the time of trial, the Department had received confirmation only that he had initiated that service. While the case was pending, he had one diluted drug-test sample, which was presumed positive, but the other five of his drug tests were negative.

14

environment was "toxic" and violent.[17]  She told the caseworker that Father was violent and controlling.

When the caseworker talked with Father in October 2022, he told her that Mother was in "inpatient detox treatment."  Father was upset about the case with his children in Tennessee and was trying to get a copy of his drug test.  While discussing his choices in women, Father told the caseworker that he was "a stupid man who has a poor choice in women; [he would] try to take them in to get them help."  Father acknowledged that the women he tried to help were usually drug addicts.  These statements concerned the caseworker because she did not think that any woman Father would bring around C.W. would "be a good choice of a mother figure or an adult role" in C.W.'s life.  The caseworker also tried to speak with Mother at the drug treatment center but was told that Mother had checked herself out.

The caseworker talked to Father again several months later.  Father denied that any domestic violence had occurred in the home.  "He reported that he blamed himself for always trying to help [Mother] and nurse her back to health only for her to get out of the frying pan and back into the fire again, and that he was sorry that [C.W.] had to go through this."

The caseworker and Father also discussed the potential placement of C.W. with Mother's sister in South Carolina.  Father did not support that placement, but he could not provide any alternative placements whom he trusted with C.W.  During the

---

[17]Mother never recounted any specific instances of abuse to the caseworker.

conversation, Father sent the caseworker a screenshot of the Texas Penal Code section defining the offense of extortion; the caseworker understood the reference to mean that Father "believed that [C.W. had been] stolen from him and that [C.W.] should have been placed with him at the beginning of the case." Father also told the caseworker that the Department was "keeping" C.W. because it was "getting money" for him.

In March 2023, Father told the Tarrant County OCOK permanency specialist that he knew where to find Mother, but he refused to give her address because "it was a home full of dangerous street gangsters on the west side of Fort Worth." He offered to "catch her, if he could, before the next court hearing." In April 2023, Mother was admitted to the hospital for an overdose and a staph infection. Mother told the permanency specialist at that time that she had no place to live after her eventual discharge, no cell phone, and no transportation. Mother told the permanency specialist that Father had physically and sexually abused her when she lived with him, that some of the abuse had happened in front of C.W., that Father had forced her to have sex with other men, and "that he was a lonely man who frequented prostitutes off of Las Vegas Trail in Fort Worth and brought them back to his home."

Despite numerous attempts by the permanency specialist to visit and observe Father's home—and despite his being ordered by the trial court to allow his home to be inspected "for safety and appropriateness"—Father refused to allow her to inspect it and evaded her attempts to make appointments to do so. In the month before trial,

the permanency specialist communicated with both Father and Mother. Father called the permanency specialist and told her that Mother was in rehab, but he refused to give her the rehab's telephone number or address because he "didn't want [Mother] to have any further issues or affects." He said that "he had been advising [Mother] on what to do."[18] Mother called the permanency specialist a week later. She said that she had lost the permanency specialist's phone number and that when she had asked Father for it, he purposefully gave her a wrong number. Mother told the permanency specialist that Father's home "was in complete disarray" and that he was angry with Mother for not returning to Tarrant County to help him clean it. Mother also told the permanency specialist that Father had "told her not to talk to [OCOK] about what was going on" at the time of C.W.'s removal and that the permanency specialist was "evil."

### c. Father's and Mother's Trial Testimony

According to Father, when he first met Mother, she was sick, hungry, and "in pretty bad shape." He fed her and bought her medicine. Father denied everything Mother wrote in her affidavit when C.W. was removed. For example, he claimed that he did not try to run over her with a car; instead, he drove around her, giving her a wide berth, and she slipped and fell while trying to run away from him. Father had

---

[18]Mother's continued contact with Father was concerning to the Department.

helped Mother get into rehab multiple times and had talked to her the night before he testified.

Father testified that the only trouble he had with working a service plan was getting vouchers turned in so that he could start the required services. Nevertheless, he claimed to have completed a psychological evaluation, parenting classes, individual counseling, and drug and alcohol treatment.[19] Father stated, "I completed every service they asked for." After paying for and completing services he had found himself, Father found out that OCOK would not accept those services toward his plan requirements. He then engaged in OCOK-approved services and paid for them with his own money.

Father testified that when OCOK inspected his home after C.W.'s birth, they "hinted" that it was cluttered, but he had straightened what OCOK had asked of him. When asked whether his home was livable for a small child at the time of trial, Father answered, "The child would be isolated to the liv[]able areas. I have baby gates and items to keep him . . . safe." He denied being a hoarder and said that he was "a collector" instead.

---

[19]According to the OCOK permanency specialist, Father had completed domestic-violence class, individual counseling, and parenting classes. But she did not get confirmation that he had completed drug and alcohol counseling, and Father gave her no proof of financial stability, nor did he allow her to inspect his home. Thus, she believed Father had not alleviated any of the Department's concerns that were present when C.W. first came into care.

18

Mother testified via Zoom from a drug treatment center in Houston. She was scheduled to be released the week after trial to an eighteen-month intensive program in the Houston area. Mother did not testify at trial about what she had told the Department representatives throughout the case—that Father was violent to her and used drugs. Mother thought that the Department's petition to terminate Father's parent–child relationship with C.W. should be denied and that C.W. would be safe with Father. Regarding the condition of Father's house,[20] she testified,

> He tries to keep everything clean, he really does. He tries to work on it. He feels like he needs extra help, sometimes, you know.
>
> The only thing I say about that is he needs to work on -- stop getting things like antiques, you know what I mean, off the side of the road, and just sell it.
>
> I mean, it's not -- I think it's a good place for [C.W.] to go to. He's got a room cleaned up. But the house needs to be worked on.

Mother denied that Father was a hoarder, said the dishes and kitchen were "always washed," and that "[h]e really tries."

### d. Analysis

Father appears to rely on the fact that Mother was a drug addict—and therefore in his view unreliable—to discount what she told the Department representatives about his abusive behavior toward her in the home and about the home's living conditions. But Father did not object to that evidence; thus, we can

---

[20]Although she had not lived there since leaving with C.W., she said Father sent her pictures of the house.

consider it in our analysis. *See In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *6 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.). And that evidence alone is both legally and factually sufficient to support the trial court's Subsection (E) finding. *See, e.g., In re E.T.*, No. 02-22-00299-CV, 2022 WL 17172492, at *4 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.) ("Violent or abusive conduct directed at the other parent or other people, even if it is not committed in the child's presence, may . . . be sufficient to show a[n endangering] course of conduct under [S]ection 161.001(b)(1)(E)." (quoting *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.))).[21]

But even without considering that evidence, the remaining evidence is legally and factually sufficient to support the trial court's endangerment finding under Subsection (E). The evidence is clear and convincing—under both sufficiency standards of review—to support the trial court's finding that Father engaged in a voluntary, deliberate, and conscious course of conduct that subjected C.W. to a life of

---

[21]Father claimed that Mother "had issues with anger control" and would become "physically aggressive when he would not give her money for drugs." But the continued occurrence of the domestic violence—regardless of who was the aggressor—can be considered in determining endangerment. *See, e.g., In re A.L.H.*, 624 S.W.3d 47, 57 (Tex. App.—El Paso 2021, no pet.) (noting that victim's return to domestic-violence relationship, "potentially subjecting the children to further instability," is a factor that can be considered in determining endangerment). *But cf. In re M.G.P.*, No. 02-11-00038-CV, 2011 WL 6415168, at *12 (Tex. App.—Fort Worth Dec. 22, 2011, pet. denied) (mem. op.) (holding that evidence was legally insufficient to prove endangerment when mother was victim of domestic violence but mother had taken precautions to protect herself and limit her abuser's access to her).

uncertainty and instability. While Father attempted to characterize his relationships with much younger, vulnerable women as rescues, he fathered multiple children with them in a short period of time—while he was still on parole and immediately thereafter—and the evidence shows that rather than doing all he could to protect C.W., Father instead enabled Mother's drug dependency, resulting in her attempting to navigate rehab and recovery while caring for C.W. Although Father appeared to be supportive of Mother's rehab attempts, the evidence does not show that he was unaware of Mother's drug use and its effects on C.W. or that he was trying his best to provide stability for C.W. properly despite Mother's drug issues. *Cf. In re J.W.*, 645 S.W.3d 726, 749–50 (Tex. 2022) (agreeing with principle that a parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment and support an endangerment finding). Father also admittedly continued to use marijuana or CBD products despite Mother's struggle with drug issues.[22]

---

[22]The facts in *In re M.P.*, on which Father relies to argue that his drug use alone is insufficient evidence to show endangerment, are distinguishable. 618 S.W.3d 88, 106 (Tex. App.—Houston [14th Dist.] 2020), *rev'd*, 639 S.W.3d 700, 703–04 (Tex. 2022) (holding that court should have deleted Subsection (D) and (E) findings from judgment instead of remanding case to trial court). In that case, there were gaps in the evidence, and drug use was the primary alleged danger to the child. *Id.* Here, Father's admitted marijuana or CBD use was but one fact that, when considered with the rest of the evidence—particularly Mother's inability to get and stay clean—showed his failure to appreciate and change his enabling course of conduct. *See, e.g., J. C.-O. v.*

Although Father substantially complied with much of his service plan, he remained distrustful of the Department and uncooperative so that the Department was unable to determine if he had made lasting behavioral changes that would allow him to provide safety and stability for C.W.; he refused to allow the Department to evaluate whether the home in which he and C.W. would live was appropriate for a small child; and he stayed in contact with Mother—who continued to use drugs—to the point that he hoped that Mother would assist in caring for C.W. if he were returned to Father. *See In re G.G.-H.*, No. 05-23-00437-CV, 2023 WL 6225410, at \*2 (Tex. App.—Dallas Sept. 22, 2023, no pet.) (mem. op.) (noting that a parent's failure to cooperate with the Department can qualify as endangering conduct). Thus, we hold that the evidence is both legally and factually sufficient to support the trial court's finding under Subsection (E).

We overrule Father's second issue. Because we have concluded that the evidence is sufficient to support the Subsection (E) finding, we need not address Father's first issue challenging the Subsection (D) finding. *See* Tex. R. App. P. 47.1; *In re L.L.*, No. 02-23-00132-CV, 2023 WL 5767483, at \*20 (Tex. App.—Fort Worth Sept. 7, 2023, pet. denied) (mem. op.).

---

*Tex. Dep't of Fam. & Protective Servs.*, No. 03-16-00271-CV, 2016 WL 6068263, at \*7 (Tex. App.—Austin Oct. 14, 2016, pet. denied) (mem. op.).

## 2. Best Interest

We also conclude that the evidence is legally and factually sufficient to prove that termination of the parent–child relationship with Father was in C.W.'s best interest. That evidence is detailed below using the framework of the *Holley* factors.

### a. C.W.'s Desires and Needs

C.W. was too young to communicate his desires; thus, this factor is considered to be neutral, weighing neither for nor against the trial court's best-interest finding. *See In re A.H.*, No. 02-23-00348-CV, 2024 WL 191229, at *5 (Tex. App.—Fort Worth Jan. 18, 2024, no pet. h.) (mem. op.). Although there was no evidence about his individualized emotional and physical needs, the Department did present evidence pertinent to a child's general need for stability and permanency. *See In re R.E.*, No. 02-23-00255-CV, 2023 WL 7851701, at *5 (Tex. App.—Fort Worth Nov. 16, 2023, no pet.) (mem. op.) (noting that "[c]hildren need long-term safety and stability; providing for a child's physical and emotional needs is of paramount importance").

At the time of trial, Father purported to still be in contact with Mother; he had failed to show that he could protect C.W. from the effects of her addiction and failed treatment; and he had failed to acknowledge that his tendency to engage in relationships with and impregnate women with significant problems—drug addiction, mental-health issues, and anger or violence issues—had failed to provide stability for C.W. In the months before trial, he had allowed a female friend to come over and spend the night. When asked about that friend, "[I]sn't it correct that she hasn't seen

23

her 12- and 13-year-old children in over two years," Father answered, "I believe that is a very bad situation with her and an abusive relationship with her husband, and that they had falsified criminal complaints against her and had her arrested several times. And she very much wants to see her children." There was also evidence that Father's poor judgment with women extended to his idea of how C.W. should be cared for. For example, Father admitted that he "might have, . . . maybe, possibly" proposed marriage to his individual counselor and that he had asked her to temporarily adopt C.W. According to Father,

> I believe she was a very good . . . person to be a surrogate mother for my son, and possibly help keep him in a happy, healthy home environment.
>
> If, you know, if I could get her to be a surrogate mother, as opposed to having my parental rights terminated, I believe she would have made an excellent choice.

According to the permanency specialist, Father had not shown that he could provide C.W. with a stable living environment because he had "not allowed [OCOK] in the house; he reportedly [was] still continuing to allow dangerous individuals into his home;[23] there ha[d]n't been very many behavioral changes . . . even if he'[d] completed some of his services; and there[ was] a concern about his decision-making and judgment-making ability." Although Father showed at visits that he loved his son and that they were engaged, playing and eating food, there had not been "many opportunities where" he had shown his ability to parent. The permanency specialist

---

[23]It is unclear to whom the permanency specialist was referring.

did not believe Father had shown he could meet C.W.'s emotional and physical needs: "[W]ithout us having been able to enter the home, we can't confirm that [C.W.] would be placed in a safe environment. We don't know if [Father] can financially take care of him. We don't know if he can cognitively take care of him." Father had also not shown he could protect C.W. from emotional and physical danger, and he had not made "very many behavioral changes."[24]

The evidence regarding Father's role in the instability of C.W.'s early life and of Father's resistance to, and lack of, demonstrated and lasting changes to provide stability weighs in favor of the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 28 (noting as relevant fact that appellant had "exhibited a pattern of conduct that is inimical to the very idea of child-rearing"); *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting that trial court making best-interest finding can take into account parent's inability to provide adequate care or stable lifestyle as well as parent's poor judgment); *cf. L.M. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-21-00635-CV, 2022 WL 1694474, at *12 (Tex. App.—Austin May 27, 2022, no pet.) (mem. op.) (holding that pattern of continuing behavior—

---

[24]Thus, the facts of this case do not show, as Father has asserted, that he had changed or improved the circumstances that had led to C.W.'s removal from custody. *But cf. In re N.L.D.*, 412 S.W.3d 810, 823–24 (Tex. App.—Texarkana 2013, no pet.) (noting that evidence a person has recently improved her life weighs against a finding that termination is in a child's best interest and summarizing evidence showing that mother in that case had made positive changes).

domestic violence—with no appreciable change weighed in favor of finding that termination was in child's best interest).

### b. Danger to C.W.

While Father admitted that he had been convicted of aggravated sexual assault of two girls under the age of ten, he did not admit that he was guilty of those offenses. Father also admitted that the State of Texas considers him to be at moderate risk to reoffend. When asked whether his past convictions should be of concern, Father said they would not be, in part because of his "severe aversion to homosexuality."

The psychologist did not attempt to evaluate Father's "propensity for any other sexual harassment towards children" because the Department did not require such testing and because she "didn't see a need to go any further than that."[25] However, she did find Father's sexual-assault convictions concerning "[b]ecause [they] would suggest that there is a propensity for the perpetrator to harm children in the future." *See In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *9 (Tex. App.—Houston [1st Dist.] 2019, pets. denied) (mem. op.) (explaining that even remote-in-time conviction for aggravated sexual assault of a child was relevant to determining whether a parent poses a danger to a child's physical or emotional well-being).

---

[25]Father testified that in the Tennessee child-custody case, that state wanted him to complete three more years of sex offender treatment at his own expense. But he opined, "Tennessee can't order me to go to sex offender treatment."

According to his psychological testing, Father appeared to possess poor coping and problem-solving skills "that seemed to affect his judgment and issues of anger control."[26] Father disagreed with the psychologist's diagnosis of him, and he pointed out that she had made errors in her original report, such as saying that C.W. had tested positive for heroin at birth and had syphilis.

According to Father, no one was living with him at the time of trial, and he had not allowed anyone else to live in or "stay periodically in" his home since late May 2022. When questioned by the Department about the woman he had allowed to spend the night—and whether the police department had been called to his home because of her—Father responded,

> I believe that CPS was coming out and alleging that we had murdered a one-year-old baby, and the baby was in our home. And after the second visit to my home I allowed the Fort Worth Police Department to come in and satisfy their curiosity with regards to these outlandish allegations.

In addition to the evidence detailed above, the evidence also shows that at the time of trial, nothing had been done to alleviate the endangering circumstances that had prompted C.W.'s removal. Mother was still unable to make lasting behavioral changes even after multiple attempts at drug treatment, she had no stable housing or safe housing situation, Father was still in contact with her, she was afraid for C.W. to live with her and Father together, and Father had not allowed the Department or

---

[26]On cross-examination, the psychologist testified that Father indicated that his anger issues were that he was the victim of domestic violence in his relationships. He denied being the aggressor with Mother.

OCOK to assess the living conditions in his home.[27] Based on all of this evidence, there was a significant risk of emotional and physical danger to C.W. if his parent–child relationship with Father was not terminated. *See L.M.*, 2022 WL 1694474, at *12.

This factor weighs in favor of the trial court's best-interest finding.

### c. Parenting Abilities, Plans for C.W., and Available Programs

Father testified that he was unemployed and received $1,247 a month from Social Security disability; C.W. received $200 per month from Social Security disability. Father's specific expenses—property taxes, utilities, car insurance, and C.W.'s expenses—before buying food were around $1,000 per month. Father believed he could financially support C.W. with his income.

Father completed many of the court-ordered services on his plan, and he arranged for many of them himself. However, the OCOK permanency specialist did not believe that Father had shown the ability to make lasting changes based on those services that would enable him to be an appropriate parent. The Department caseworker testified that Father's visits with C.W. during the case were frequent and "good." C.W.'s caregivers had some concerns about Father's bringing C.W. "too much candy," but there were no other problems. According to the permanency

---

[27]The ad litem was concerned about the Department's lack of access to Father's house: "[T]he truth is, we cannot really assess if that place is safe, if his house is safe for the child."

specialist, Father had not missed a visit and interacted and behaved appropriately with C.W. Nevertheless, the Department had a "continuous concern" that Father had not followed "the visitation rules in regards to speaking poorly against the Department, the foster home, and others in the visits." On one occasion, he had also overfed C.W. "to the point where [C.W.] vomited before the evening several times."

Although the Department had considered Mother's sister as a placement, she had declined by the time of trial. Father had told the permanency specialist that he was considering offering his brother as a placement because he could pass a background check; however, Father ultimately determined that his brother "wasn't responsible." Father also alluded to a family friend as a possible placement but never gave the Department that friend's information. Father testified at trial that he did not have any family member with whom he felt it would be appropriate to place C.W.[28]

Father wanted C.W. returned to his possession. He testified that C.W. "means the world to me." If C.W. were returned to Father, he would then make plans for C.W.'s daycare and education. Father wanted Mother to be able to achieve and maintain sobriety, and if she did so, he wanted the three of them to have an amicable relationship. He hoped she would be able to get an apartment and help share in C.W.'s care.

---

[28]According to Father, he had "some very good relatives" who "don't happen to live in Texas and . . . don't want to get involved in going through these legal matters."

While the case was pending, Mother told the permanency specialist that she did not want C.W. to be adopted; she wanted him returned to her. At trial, Mother testified that she did not want her rights to be terminated because, despite her drug issues, she thought she was a good mom when clean. When asked whether the trial court should allow C.W. to be placed with Father, Mother testified, "I think they should. [Father] loves that little boy with everything in him. That's all he talks about. I can't get him to stop talking about [C.W]. He loves that little boy and he will do anything in his power to keep that little boy happy and content."

The permanency specialist testified that C.W. was "doing wonderful" in his foster home, was "surrounded by love and nurturing," was healthy, was in a Pre-K program and was bilingual, and was "functioning and developing normally like a regular three year old." His foster parents could provide him a safe and stable living environment and wanted to adopt him into their "well-bonded and connected family." According to the permanency specialist, "the home is very structured, [with] two working parents[ and] siblings, and it's just a wraparound of support in the home. They take care of all his basic needs, educational needs, medical needs, without any concern." The ad litem reported that C.W. "was very bonded with his foster family" and well taken care of. Mother testified that she had visited with C.W.[29] and said he

---

[29]Contrary to the OCOK permanency specialist's testimony that Mother had not attended any visits with C.W., Mother testified that she had attended some virtual visits with C.W. In announcing its findings at the end of trial, the trial court noted,

30

seemed to love his foster mother and that the foster family was "doing a good job with him."

The permanency specialist thought that terminating the parent–child relationship would be in C.W's best interest:

> [C.W.] is in a very loving and stable environment with . . . adoption-motivated parents who adore and love him, they're able to meet his needs for now and in the future, and all his needs are being taken care of, and to take him out of that and put him in a . . . different placement would not be in his best interest.

This factor also weighs in favor of the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 28 (noting that parent's lack of concrete plan to provide emotional or physical care for child is relevant to best-interest analysis); *In re A.C.B.*, 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.) ("[A] parent's compliance with a service plan does not preclude a finding that termination is in the child's best interest.); *cf. J.D.*, 436 S.W.3d at 118 (holding that when child is too young to express desires, a trial court may consider evidence of that child's bond with foster family).

#### d. Acts and Omissions Suggesting Relationship Improper

Father admitted placing a tracking device in a toy he gave to his children in Tennessee and that he had a misdemeanor charge pending against him in that state for doing so. He planned to turn himself in "at some point in the future" but would not do so until he had "everything set up to have [C.W.] taken care of." He admitted that

---

"The mother has not regularly visited or maintained physical contact with the child, although she has done so by electronic means."

he had not pursued custody of his children in Tennessee because he did not want "to try to fight CPS on two state fronts" and instead chose to focus on C.W.'s case.

Father also admitted placing a tracking device in a birthday present that he had bought C.W. He said he was justified in doing so because his children had been abducted and he wanted to keep them safe. When asked if he intended to go to the foster home's address if his rights were terminated, he said, "I believe on Christmas I would go and drop his bicycle off." When asked whether he would do so uninvited, he answered, "Santa Claus comes uninvited every year."

When the permanency specialist called Father in July 2023—two months before trial—to explain why the Department had changed its goals to termination of the parent–child relationship, Father "became angry and spoke about an unannounced visit that [she had] made to his house."[30] According to the permanency specialist, who is African American, when she asked Father why he would not allow her in his house, he "responded that he is racist and he is prejudice[d] and someone, especially [her], would never be allowed into his house."[31] When asked whether she thought living with a "self-avowed racist" would be in C.W.'s best interest, the

---

[30]When asked whether he had ever allowed the permanency specialist to see the house, Father was evasive; he testified, she "has never scheduled an appointment. She showed up, unannounced, during the middle of a tornado."

[31]When asked if he told her he was a racist, Father said, "I believe I made a comment with regards to racism."

permanency specialist answered, "No," because she thought "[i]t would affect [C.W.'s] social and emotional development."

Furthermore, Father's past convictions—although committed against children of a different gender—are relevant to the trial court's consideration of whether he understood and appreciated appropriate judgment and decision-making when dealing with children. *See S.G.*, 2019 WL 1448870, at *9.

We conclude that this factor likewise weighs in favor of the trial court's best-interest finding.

### e. Excuses for Parent's Acts and Omissions

According to Father, he thought the marijuana he smoked "was legal CBD and things that they sell in the smoke shop."

When asked at trial what he was doing to address his racism, Father answered,

Well, it's very difficult in prison. You develop a lot of hatred for people acting in an inappropriate manner. And so you're in there with the worst of the worst.

And I mainly hate stupid people and liars. Maybe I misspoke when I said I was a racist. But stupidity and lying are the top two things. And it doesn't matter if you're black, white, or Mexican, or Chinese, or any other race on Earth.

If you're a liar, I hate you. And if you're stupid -- and my definition of stupid is you actively passed up an opportunity to learn and you're not trying to better yourself -- then I've got no time for you.

I was very upset. I don't remember the context of the conversations I was having with [the permanency specialist] on the day that I spoke that. . . .

33

Finally, Father argues on appeal that he was justified in not allowing the permanency specialist to visit his home when she arrived unannounced as tornado sirens were sounding. But as with Father's other excuses, the trial court was allowed to weigh its sincerity and reasonableness, and to determine whether it sufficed as justification for Father's action. *See In re J.S.H.*, No. 04-23-00078-CV, 2023 WL 4610052, at *8 (Tex. App.—San Antonio July 19, 2023, pet. denied) (mem. op.).

We hold that this factor also weighs in favor of the trial court's best-interest finding.

### f. Analysis

The evidence shows that Father had not shown the ability to provide C.W. with a safe and stable environment.[32] Specifically, he continued to seek out questionable

---

[32]The permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a). Citing factors relevant to determining—in pretrial permanency hearings—whether a parent is willing or able to provide a safe environment, Father contends that the trial court could have named the Department C.W.'s permanent managing conservator—rather than terminating their parent–child relationship—with Father's participation in further counseling and "a later review of [his] home, his lifestyle, [Mother's] sobriety, services completed, [and] housing and employment after completion of her drug rehabilitation." *See id.* § 263.307(b) (listing thirteen factors); *see also* §§ 263.304–.305 (setting forth findings that must be made at pretrial permanency hearings); *In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pets. denied) (considering factors in best-interest determination after termination of parental rights). Many of these statutory factors overlap with the *Holley* factors that we have already discussed; to the extent they do not, they are either not applicable to our analysis or the record contains no evidence pertinent to them. In any event, because we conclude that the evidence is legally and factually sufficient to support the best-interest finding, in large part because of the evidence that Father had not shown the ability to provide a safe and stable environment for C.W., we are not persuaded by Father's argument. *See In*

34

relationships; failed to demonstrate an understanding of why this was a problem for C.W.; showed a lack of appropriate boundaries; had no concrete plans for taking care of C.W. and no suitable support system in place; failed to appreciate the potential negative effect of his recreational marijuana or CBD use on C.W.; and, even more importantly, failed to acknowledge or make plans for the significant risk to C.W. posed by his prior conviction. Weighing the *Holley* factors and the evidence in its entirety according to the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent–child relationship between Father and C.W. is in C.W.'s best interest. *See Z.N.*, 602 S.W.3d at 545 (legal sufficiency standard of review); *C.H.*, 89 S.W.3d at 18–19 (factual sufficiency standard of review).

We overrule Father's third issue.

## IV. CONCLUSION

Having overruled Father's dispositive second and third issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: February 15, 2024

---

*re J.G.*, No. 02-21-00020-CV, 2021 WL 2966165, at *11 (Tex. App.—Fort Worth July 15, 2021, no pet.) (mem. op.).