**Opinion filed March 27, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00267-CV

_____

## IN THE INTEREST OF S.B., A CHILD

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 11136-CX**

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from an order in which the trial court terminated the parental rights of the mother and father, Appellants, to their child, S.B.[1]  On appeal, Appellants contend that the evidence is legally and factually insufficient to support the trial court's finding that terminating their parental rights is in the child's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2024).

---

[1]We use initials to refer to the child.  *See* TEX. R. APP. P. 9.8(b).

### I. *Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. *Id.* § 161.001(b). To terminate one's parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1)(A)–(V), and that termination is in the best interest of the child. *Id.* § 161.001(b)(2). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2019).

In this case, the trial court found that clear and convincing evidence established that Appellants committed at least one of the acts listed in Section 161.001(b)(1)—specifically, that Appellants: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; and (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child. *See id.* § 161.001(b)(1)(D), (E). The trial court further found, pursuant to Section 161.001(b)(2), that termination of Appellants' parental rights was in the child's best interest. *See id.* § 161.001(b)(2).

In reviewing a legal sufficiency challenge, we must decide whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). Cognizant of the required appellate deference to the factfinder, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotation marks omitted). "However, we may not disregard 'undisputed

2

facts that do not support the finding,'" and the factfinder is "the sole arbiter of the witnesses' credibility and demeanor." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) then quoting *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021)). As such, when considering the credibility of the evidence presented, we may not substitute our judgment for that of the factfinder. *J.F.-G.*, 627 S.W.3d at 316.

In assessing whether the evidence is factually sufficient, we weigh the disputed evidence that is contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002); *In re L.C.C.*, 667 S.W.3d 510, 512 (Tex. App.—Eastland 2023, pet. denied).

With respect to the best interest of a child, no unique set of factors need be proved. *L.C.C.*, 667 S.W.3d at 513; *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). Further, the best interest determination does not restrict the proof to any specific factor or factors. *In re J.S.*, 687 S.W.3d 541, 547 (Tex. App.—Eastland 2024, no pet.). However, courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the

existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

To support a best interest finding, the Department is not required to prove each *Holley* factor; in some circumstances, evidence of the presence of only one factor will suffice. *C.H.*, 89 S.W.3d at 27; *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.). Additionally, the same evidence that proves one or more statutory grounds for termination may also constitute sufficient, probative evidence illustrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28; *C.J.O.*, 325 S.W.3d at 266.

The absence of evidence of some *Holley* considerations does not preclude the factfinder from reasonably inferring or forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence indicates that the parent-child relationship and the parent's conduct has endangered the safety and well-being of the child. *C.H.*, 89 S.W.3d at 27. This is so because the best interest analysis evaluates the best interest of the child, not the parent. *J.S.*, 687 S.W.3d at 548 (citing *In re E.C.R.*, 638 S.W.3d 755, 767 (Tex. App.—Amarillo 2021, pet. denied)).

In this regard, the factfinder may measure a parent's future conduct by his or her past conduct in determining whether termination of the parent-child relationship is in the child's best interest. *Id.*; *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). The factfinder may infer that a parent's past conduct that endangered the safety and well-being of the child may recur in the future if the child is returned to the possession of the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied). Additionally, the factfinder may infer from a parent's past inability to meet the child's physical and emotional

4

needs an inability or unwillingness by the parent to meet the child's physical and emotional needs in the future. *J.D.*, 436 S.W.3d at 118; *see also In re A.S.*, No. 11-16-00293-CV, 2017 WL 1275614, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op.).

## II. *Factual and Procedural Background*

In the early morning hours on March 20, 2023, Appellants left five-year-old S.B., and her eight-year-old half-brother, R.C.,[2] home alone so they could go to a methadone clinic. While S.B. was watching television on the couch and R.C. was asleep in another room, a lit candle fell over and ignited a fire. The mother later admitted to lighting the candle before she and the father left. The children were able to escape without injury and they flagged down a person that was driving by. Law enforcement contacted the Department of Family and Protective Services (the Department) when they were unable to reach Appellants. Appellants were each charged with the state jail felony offense of endangering a child. *See* TEX. PENAL CODE ANN. § 22.041(c), (f) (West Supp. 2024).

The Department initially gave Appellants the opportunity to participate in family-based safety services (FBSS).[3] Jamie Olson, Appellants' assigned FBSS caseworker, testified that Appellants did not comply with the requirements of their family-based safety services. "[I]t was very hard to keep track of [Appellants]" and "to maintain consistent contact with them." Appellants moved without notifying the

---

[2]R.C.'s biological father was originally a party to the underlying suit, but neither R.C. nor his father are parties to this appeal. Prior to the trial court's issuance of its final order of termination, the mother and R.C.'s father executed a mediated settlement agreement (MSA) with the Department, and the action concerning R.C. was severed into a separate cause number.

[3]"Family-based safety services are protective services provided to a family whose children are not in the conservatorship of the Department." 40 TEX. ADMIN. CODE ANN. § 700.710 (2021). The Department's Child Protective Services Division provides family-based safety services to families and children "to: (1) protect the children from abuse and neglect; (2) help the family reduce the risk of future abuse or neglect; and (3) prevent the removal of the children from their home." *Id.*

5

Department, never submitted to drug testing, and denied Olson access to their home on several occasions.

Then, on July 26, 2023, the mother was arrested for possession of methamphetamine, a state jail felony. She went with the children to the Noah Project, a shelter in Abilene for victims of family violence, sexual assault, and human trafficking, because she claimed the father "had started hitting her regularly and . . . spitting on her." Inside the mother's bag in her room, staff with the Noah Project found a small plastic bag of methamphetamine, syringes, and a broken pipe. The mother blamed the father for "planting drugs on her," and reported that he "possibly relapsed." However, she later admitted to using methamphetamine on July 25.

Following the mother's arrest, the Department took custody of S.B. and R.C., and Olson contacted the father. Olson testified about the mother's drug possession arrest, and the father's alleged domestic abuse and relapse. When Olson advised the father to submit to drug testing and asked for possible relatives with whom the children could stay, the father responded, "I'm not going to do s--t for you a------s."

The Department was granted temporary managing conservatorship of the children on July 27, 2023. The children were drug tested upon removal; S.B.'s results were negative, but R.C. tested positive for methamphetamine. At the adversary hearing on August 3, 2023, the father conceded that he had relapsed on methamphetamine and marihuana.

The final hearing commenced on July 18, 2024, and was recessed until August 15, 2024. Patricia Ray, the 2INgage permanency case manager, testified that Appellants completed most of the services required by their family plans of service. The mother, specifically, had complied with her community supervision conditions. She also completed inpatient substance abuse treatment at Serenity House in Abilene

6

and tested negative on every drug screen except one. However, the mother did not have "long-term" stable housing. According to Ray, the mother's "longest living arrangement . . . was living at the 180 House," a transitional home after inpatient treatment, "from the end of September [through] the end of March [2024]." Due to its residents being "known addicts and people with past criminal history," it was not safe or appropriate for a child. Similarly, the father had "moved various different places, but none . . . have really been appropriate for [S.B.]"

The father testified that in August 2023, while he and the mother were still together, he bonded her out of jail before she went to the Serenity House. The father candidly admitted that their drug of choice was methadone and that "methamphetamine was the secondary problem." While the mother was in treatment, he "stayed on the streets," and sometimes stayed with a friend whom the Department suspected was also a drug addict. When the mother was discharged from Serenity House, she ended the relationship with the father and informed him that she would only communicate with him about the children.

The father began the inpatient treatment program at Serenity House in October 2023, but according to the father, "they kicked [him] out" after he "jumped the fence." He went to Discovery Point Retreat shortly thereafter and completed the thirty-day residential program in November 2023. From November 2023 to April 2024, the father lived in a transitional home. Since leaving the transitional home, the father had been staying with his close friends and plans to remain there. Ray opined that this was a safe and appropriate home for a child, but the father had only been there one and one-half months at the time of the final hearing.

In March 2024, the mother married a person with an extensive criminal history that includes, among other things, two convictions for assault family violence. The mother did not notify the Department of the marriage until over a month later. Between March and June, the mother and her new husband lived in Gainesville, then

7

Azle, then moved into an apartment in Sweetwater. In July 2024, her new husband was arrested because he tested positive for methamphetamine while on bond. He remained in the Parker County Jail until August 13, 2024, when he pled guilty to the third-degree felony offense of evading arrest or detention with a vehicle, which he committed in January 2024, and was placed on community supervision. *See* PENAL § 38.04(b)(2)(A).

The mother has "had about four different jobs throughout the [pendency of the] case," missed three scheduled visits with S.B. in March 2024, and another visit on April 7, 2024, because she was incarcerated. The father attended all of his scheduled visits but would discuss his services and medical issues with S.B., "which upset her." The father explained that he has been diagnosed with a blood disorder, seizures, and post-traumatic stress disorder. His purported narcolepsy "was pretty much a direct result of methadone." S.B. also contracted head lice "three to four times" after her visits with the father and needed several treatments to get rid of them.

The father's in-person visitation was suspended due to a "behavioral incident between [the father] and [Ray]." On February 15, 2024, Ray attempted to conduct an unannounced home visit. While talking to the father outside the home, the father became "very upset and was getting verbally aggressive and was cussing at [Ray]." Thereafter, the father was only permitted to visit with S.B. via Zoom. Since the suspension of the in-person visits with the father, S.B. has not contracted head lice.

The father reported to Ray in July 2024 that he began working at a carpet cleaning company. Before that, the father claimed to work "under the table" at a construction company. However, he never showed actual proof of employment in the form of a paystub for either job.

Additionally, the father's "drug test results over the last year" revealed that he was not abstaining from drug use. He admitted to methamphetamine and methadone

use prior to October 2, 2023, but claimed that he "[has] not touched any drug at all" since then unless prescribed. The father tested positive for marihuana consistently throughout the case but has been "on the Compassionate Use Registry" since June 2024. The father purportedly had prescriptions for Alprazolam, Fluoxetine, Suboxone, and Adderall for his "excessive sleepiness." However, he never provided proof of those prescriptions to the Department. He attributed his positive drug test results for Nordazepam and Temazepam in June 2024 to the Alprazolam, but Ray confirmed that using Alprazolam would not cause one to test positive for those substances.

At the time of the final hearing, S.B. had been living with R.C.'s paternal grandparents for approximately eleven months. When S.B. was placed with R.C.'s grandparents, they noticed "the back of an earring imbedded into the back of her ear." The skin on her ear had grown over it, and it was "severe enough that it required" a medical procedure involving "numbing and anesthesia" to remove it. S.B. has also been engaging in play therapy because she initially expressed anger by throwing things and screaming at people. The grandmother attested that R.C. exhibited the same issues when he came into their care, but both children have learned how to express themselves in better, healthier ways.

In April 2024, R.C.'s grandparents took S.B. to have surgery on her tonsils and ears. She had suffered mild hearing loss due to multiple ear infections; Ray did not know whether Appellants had arranged for S.B. to be medically treated for these infections. But S.B.'s hearing has improved since the surgery, and she "is doing really well." Ray explained that since living with the grandparents, S.B. has "opened up a lot," is "very happy there, and . . . that home is very suitable and appropriate for her." R.C. was also living with them, and Ray opined that "any separation from each other would cause severe harm emotionally." R.C.'s grandparents hope to adopt S.B., and it was the Department's position that the grandparents, "at this point in

time . . . are the only safe and stable home [for the children]." Ray testified that it is in S.B.'s best interest to remain with R.C.'s grandparents with the ultimate goal of adoption.

In addition to his felony indictment that coincided with the Department's involvement, the father had been previously convicted of possession of heroin, a state jail felony, in June 2016, and misdemeanor drug possession in January 2010. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(2), 481.115(b) (West Supp. 2024). The mother was ultimately convicted of endangering a child and possession of methamphetamine and was placed on community supervision. *See id.* §§ 481.102(6), 481.115(b); PENAL § 22.041(c). The father's child endangerment case was still pending when the trial court signed its termination order.

The trial court terminated Appellants' parental rights under Section 161.001(b)(1)(D) and (E) and found termination to be in the best interest of S.B. This appeal followed.

### III. *Best Interest of the Child Determination*

Appellants only challenge the legal and factual sufficiency of the evidence to support the trial court's finding that termination of their parental rights is in the best interest of S.B. "'[B]est interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (quoting *Holley*, 544 S.W.2d at 371–72). We reiterate that the trial court, as the trier of fact, is the sole judge of the witnesses' credibility. *J.F.-G.*, 627 S.W.3d at 312. We may not disturb the factfinder's determinations so long as those determinations are not unreasonable. *Id.* at 311–12; *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Affording due deference to the trial court, as we must, we hold that, based on the evidence in the record and the application of the *Holley* factors, the trial court could have formed a firm belief or

conviction that termination of Appellants' parental rights was in the best interest of S.B. *See Holley*, 544 S.W.2d at 371–72.

Evidence of each *Holley* factor is not required to support a best interest finding. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.O.*, No. 05-22-01019-CV, 2023 WL 2237084, at *11 (Tex. App.—Dallas Feb. 27, 2023, no pet.) (mem. op.). Put differently, the absence of evidence regarding some of these factors does not preclude a best interest finding, "particularly if [the] undisputed evidence shows the parental relationship endangered the child's safety." *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.). Consequently, "evidence relating to one single factor may be adequate in a particular situation to support a finding that termination is in the best interests of the child." *J.S.*, 687 S.W.3d at 552 (quoting *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.)).

As the factfinder, the trial court, in its best interest determination, may infer that a parent's past endangering conduct may recur if the child is returned to the parent. *See In re L.N.C.*, 573 S.W.3d 309, 318 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *J.D.*, 436 S.W.3d at 118. Evidence that is relevant to and supports Section 161.001(b)(1) termination grounds may also be probative and relevant to the best interest determination. *See E.C.R.*, 638 S.W.3d at 768 (citing *C.H.*, 89 S.W.3d at 28); *In re C.V.L.*, 591 S.W.3d 734, 753 (Tex. App.—Dallas 2019, pet. denied); *C.J.O.*, 325 S.W.3d at 266. Here, Appellants do not challenge the trial court's endangerment findings. *See* FAM. § 161.001(b)(1)(D), (E). So long as the evidence supports those findings, they are binding on this court as valid grounds for termination. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *J.S.*, 687 S.W.3d at 552; *In re J.G.*, 592 S.W.3d 506, 506 n.2 (Tex. App.—Waco 2019, no pet.). In this regard, the trial court could properly consider Appellants' endangering conduct in determining whether the

11

termination of their parental rights was in the best interest of S.B. *See E.C.R.*, 402 S.W.3d at 249–50; *C.H.*, 89 S.W.3d at 28; *C.J.O.*, 325 S.W.3d at 266.

The evidence that Appellants endangered S.B. supports the trial court's finding that terminating their parental rights was in S.B.'s best interest. The Department intervened because Appellants left S.B. and another child, R.C., home alone to go to a methadone clinic, and a fire started in the home because the mother left a candle burning. As a result, Appellants were indicted for endangering a child. A few months later, the mother took S.B. and R.C. to the Noah Project after the father was allegedly violent toward the mother. *See In re D.J.W.*, 624 S.W.3d 60, 67 (Tex. App.—El Paso 2021, no pet.) ("domestic violence may support a finding of either environmental or course-of-conduct endangerment"). The mother brought methamphetamine and drug paraphernalia into the shelter and was charged with another felony offense. *See In re J.A.R.*, 696 S.W.3d 245, 257 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) (the parents' years of drug use supported the trial court's best interest finding). The mother was placed on community supervision in May 2024, and the father was still awaiting trial for child endangerment when the final hearing concluded. *See In re R.R.A.*, 687 S.W.3d 269, 279–281 (Tex. 2024); *In re S.H.*, No. 01-22-00255-CV, 2022 WL 17254956, at *18 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.) ("Criminal activity that exposes the parent to the potential for incarceration is relevant to the trial court's best-interest determination."). And while S.B. tested negative upon removal, R.C. tested positive for methamphetamine. *See Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (an endangerment finding may be supported by evidence that shows how a parent treated other children).

Appellants' endangering conduct was largely attributable to their persistent methamphetamine and methadone use before and after the children's removal. A

12

parent's illegal drug use supports a finding that termination is in the child's best interest. *See, e.g.*, *In re C.S.*, No. 11-24-00186-CV, 2024 WL 5080505, at *13–15 (Tex. App.—Eastland Dec. 12, 2024, no pet.) (mem. op.) (considering mother's unrepentant marihuana use in the best interest analysis (citing *J.S.*, 687 S.W.3d at 554)); *see also In re Z.B.*, No. 11-24-00061-CV, 2024 WL 3995522, at *4–5 (Tex. App.—Eastland Aug. 30, 2024, no pet.) (mem. op.). That is because persistent drug use by parents poses infinite potential dangers to their children. *See, e.g.*, *In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (A continuing pattern of illegal drug use "implicates most of the *Holley* factors."); *E.C.R.*, 638 S.W.3d at 768 (A parent's drug use supports a finding that termination of parental rights is in the best interest of the child.); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with his family service plan support a finding that termination is in the best interest of the child."). Further, the Texas Supreme Court recently reiterated that a parent's continuing pattern of drug use may support a finding of endangerment, due to the "attendant risks to employment, housing, and prolonged absence from the children." *R.R.A.*, 687 S.W.3d at 281.

This case is indicative of the risks posed by a parent's ongoing drug use. *See id.* at 279–281. Appellants' drug use directly endangered S.B., which also resulted in their absence from S.B.'s life while they were either in jail, residential treatment, or on felony community supervision. *See* PENAL §§ 12.35(a), 22.04(c) (Endangering a child has a punishment range of no less than 180 days but no more than two-years' confinement in a state jail facility.). Such conduct "exposes the children to the possibility that [Appellants] may be impaired or imprisoned," which weighs in favor of finding that the termination of Appellants' parental rights is in S.B.'s best interest. *See J.S.*, 687 S.W.3d at 551. Moreover, the father's aggression also caused the suspension of his in-person visits with S.B., and neither parent demonstrated the

ability to maintain steady employment. The mother was legally employed at the time of the final hearing but only had that job for a few months. And the father never provided proof of employment. *See J.D.*, 436 S.W.3d at 119 ("A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest.").

Appellants failed to maintain long-term, stable housing that was safe and appropriate for S.B. The father was homeless prior to inpatient treatment, and the mother moved several times during the pendency of the case. Further, neither parent articulated any plan to personally provide for S.B. *See id.* at 119–20 ("The fact finder may compare the contrasting plans for a child by the parent and the Department and consider whether the plans and expectations of each party are realistic or weak and ill-defined."). In fact, the father expressed that he is "grateful that [the Department] stepped in," and agreed that he did not have a stable living situation for S.B. while residing in various treatment facilities or transitional homes. He asked the trial court, at minimum, to permit him to maintain contact with S.B., then said: "I didn't put her in any compromising situations or anything until I—until I relapsed—until I relapsed." Because a parent's illegal drug use "implicates most of the *Holley* factors," the trial court was reasonably concerned that Appellants would continue to expose S.B. to drug-related danger, other criminal activity, and instability were she returned to their care. *See E.D.*, 682 S.W.3d at 607; *see also In re N.J.H.*, 575 S.W.3d 822, 834–36 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (father's history of drug use and continued drug use during case bore on the second, third, fourth, and seventh *Holley* factors—child's emotional and physical needs, emotional and physical danger to the child, father's parental abilities, and stability of the home—thus supporting the best interest finding).

14

Additionally, Appellants' partial compliance with their service plans is insufficient to alleviate the Department's and the trial court's rational concerns for S.B.'s safety and well-being. Significantly, the mother's service plan required that she "shall not knowingly associate with anyone who engages in criminal activities or is a known addict outside of a therapeutic environment." Yet, her new husband had several criminal convictions and was placed on community supervision for a felony offense that he committed two months before he and the mother were wed. As for the father, he did not cease using methamphetamine and methadone until October 2, 2023, nearly seven months after the Department's initial involvement. *See, e.g.*, *S.O.*, 2023 WL 2237084, at *12–13 ("Mother's drug use was not isolated but had been an ongoing problem in her life."); *see also N.T.*, 474 S.W.3d at 479 ("[R]ecent improvement alone is not sufficient to avoid termination of parental rights." (quoting *In re K.D.C.*, No. 02-12-00092-CV, 2013 WL 5781474, at *16 (Tex. App.—Fort Worth, Oct. 24, 2013, no pet.) (mem. op.)). The trial court could properly consider the father's continued drug abuse after the children's removal, and the mother's choice of companion, in determining whether termination was in S.B.'s best interest. *See In re I.E.P.*, No. 04-24-00255-CV, 2024 WL 3802517, at *3–4 (Tex. App.—San Antonio Aug. 14, 2024, no pet.) (mem. op.) ("drug use can destabilize the home and expose children to physical and emotional harm if not resolved"); *In re Z.G.*, No. 02-23-00038-CV, 2023 WL 3521848, at *4–5 (Tex. App.—Fort Worth May 18, 2023, pet. denied) (mem. op.) ("[E]vidence of past drug use . . . supports a finding that the parent has endangered the child's emotional and physical needs and posed a danger to the child. . . . [A]s to future drug use, a factfinder may measure a parent's future conduct by his past conduct.") (internal citations omitted). The record is thus replete with evidence of Appellants' inability to adequately parent S.B. or provide her with a safe, drug-free home environment,

which supports the conclusion that the parent-child relationship is not an appropriate one. *See Holley*, 544 S.W.2d at 372.

Given the child-centered focus of the best interest inquiry, we may not discount S.B.'s improvement in her safe and stable placement with R.C.'s grandparents. *See J.W.*, 645 S.W.3d at 746–47. "When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with [their] parent." *In re Y.G.*, No. 01-22-00181-CV, 2022 WL 3362953, at *16 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, pet. denied) (mem. op.) (quoting *J.D.*, 436 S.W.3d at 118); *see also N.J.H.*, 575 S.W.3d at 834 (stating that evidence showing that a young child had bonded with foster family supported the trial court's best interest finding). The evidence showed that S.B. formed a bond with the grandparents, and was able to be in the same home as her half-brother, R.C. The evidence likewise supports the inference that S.B. feared returning to the mother. The grandmother observed that S.B. "was scared" and had nightmares at the thought of returning to her mother. She further noticed while supervising virtual visits between S.B. and the father that "it always seem[ed] like [S.B. was] becoming the adult and checking on him." Since being placed with R.C.'s grandparents, S.B.'s physical health, emotional wellness, and behavioral issues have improved. The trial court could have reasonably and rationally concluded that the grandparents provided the safest and most stable home environment for S.B. and would continue to do so upon adopting her as planned.

We conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of Appellants' parental rights is in the best interest of S.B. *See J.W.*, 645 S.W.3d at 741; *Holley*, 544 S.W.2d at 371–72.

Accordingly, we overrule each parent's sole issue on appeal.

## IV. *This Court's Ruling*

We affirm the order of the trial court.


W. STACY TROTTER

JUSTICE


March 27, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.